**William Earl RAYFORD, Appellant,**

v.

**The STATE of Texas.**

**No. 73991.**

Court of Criminal Appeals of Texas.

Nov. 19, 2003.

Rehearing Denied Jan. 28, 2004.

---

1. 712 S.W.2d 755 (Tex.Crim.App.1986).

C. Wayne Huff, Dallas, for Appellant.

Anne B. Witherholt, Asst. DA, Dallas, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, J.J., join.

Appellant was convicted in December 2000 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises twenty-four points of error. We affirm.

In his first point of error, appellant claims the Texas statute which allows a conviction for capital murder arising from murder in the course of a kidnapping vio-

---

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

lates appellant's rights against cruel and unusual punishment and to due process of law under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution by failing to narrow the class of offenses for which the death penalty may be sought. Appellant argues that under this Court's interpretations of the relevant provisions, it would be nearly impossible for an intentional or knowing murder to occur that did not also necessarily involve a kidnapping. Appellant claims this Court's opinion in *Hines v. State*, 75 S.W.3d 444 (Tex.Crim.App.2002), interpreted the law in such a way that the class of those who are death-eligible under the kidnapping provision is not sufficiently narrowed. We have previously addressed and rejected identical claims subsequent to our opinion in *Hines*. *Reyes v. State*, 84 S.W.3d 633, 637 (Tex.Crim.App.2002). Point of error one is overruled.

In his second and third points of error, appellant claims the evidence is legally and factually insufficient to prove that he committed murder in the course of committing or attempting to commit kidnapping. Appellant claims the evidence is insufficient to show that the victim was being restrained at the time of her death.

Appellant was Carol Hall's former boyfriend and had lived with Hall and her children for about three years. A couple of months before the offense, Hall asked appellant to move out and ultimately removed him from her home with the help of her uncle. Hall's twelve-year-old son, Benjamin Thomas, testified that Hall was afraid of appellant. About 6:30 on the morning of the offense, appellant entered Hall's house with a key. Appellant and Hall began to argue about appellant having a key to the house. The argument escalated, and Hall began screaming for Thomas. When Thomas woke up and came out of his room, appellant stabbed him in the back with a knife. Hall fled the house and ran down the street toward her mother's house. Appellant ran after her and caught her before she reached the next house. Hall was wearing her night clothes and was barefooted.

Thomas, who ran from the house after them, saw appellant pick up Hall and throw her over his shoulder. Hall was screaming and beating on appellant as he carried her toward a creek behind the house. Thomas ran to a neighbor's house and called the police. Dwayne Johnson, a bus driver who was parked at the intersection by Hall's house, saw a woman and a man run from Hall's house. Johnson testified for the defense that when the man caught the woman he beat her severely in the head area to the point that she became "lifeless." The man then dragged her behind the house where Johnson could no longer see them.

Police arrived on the scene and began searching for Hall. About an hour later, appellant appeared in Hall's backyard. He was wet and shivering and complaining of an injury to his knee, and he appeared to have grass and blood on his clothes. Appellant was arrested and taken to a hospital for treatment of his injuries. He consented to a search of his person which included giving samples of blood, saliva, and trace evidence.

Hall's body was found shortly thereafter about 300 feet inside a culvert pipe. There was a large blood stain on the concrete wall of the pipe about 150 feet from the entrance. Water was running through the bottom of the pipe. The floor of the pipe, especially where the water was deepest, was covered with broken bottles, glass objects, metal, rocks, sticks, and other debris.

Dallas County Medical Examiner Jennie Duvall testified to Hall's injuries. There was evidence of both ligature and manual

strangulation. There were blunt force injuries including blows to the face and scalp and injuries to the knees, upper chest, and shoulder. There were sharp force injuries inflicted by a sharp object such as a knife, including a stab wound on the inside of an elbow. There were also numerous superficial cuts and scrapes about the head and body. The injuries to the head were consistent with striking or slamming against concrete. There were no cuts or other injuries to Hall's feet, suggesting that she was carried through the culvert. Duvall testified that Hall was alive when strangled. The cause of death was determined to be strangulation, with blunt and sharp force injuries. Hall could have died from the strangulation alone, the blunt force injuries to her head alone, or the combination of these injuries. Duvall further testified that it was her opinion that Hall died in the culvert because the culvert was the most likely surface to have caused the head injuries and no blood was found until some 150 feet inside the culvert. She conceded on cross-examination, however, that Hall could have been strangled anywhere.

Swabs of trace blood taken from appellant's lip, head, and neck matched Hall's DNA. Blood on appellant's shirt matched Hall's DNA. The blood stain on the concrete in the culvert also matched Hall's DNA. The DNA expert testified that the probability of the DNA belonging to someone other than Hall was one in 116 billion.

Appellant argues that the evidence does not establish that at the time of Hall's death, appellant was in the course of committing or attempting to commit kidnapping. Appellant maintains that there is nothing to establish whether Hall was killed immediately after appellant carried her away or nearer to the time appellant returned about an hour later.

■ We review the legal sufficiency of the evidence by viewing it in the light most favorable to the verdict and asking whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A person commits kidnapping by intentionally or knowingly abducting another person. TEX. PENAL CODE § 20.03(a). Abduction means to restrain a person with intent to prevent his liberation by (a) secreting or holding him in a place he is not likely to be found; or (b) using or threatening to use deadly force. *Id.* at § 20.01(2). Restrain means to restrict a person's movements without consent so as to interfere substantially with the person's liberty by moving the person from one place to another or by confining the person. *Id.* at § 20.01(1).

■ Viewing the evidence in a light most favorable to the verdict, the evidence is sufficient to show that appellant abducted Hall. Appellant's actions in pursuing Hall with a knife, knocking her to the ground and beating her, then picking her up and carrying her away, amounted to restraint with intent to prevent her liberation by using or threatening to use deadly force. Whether or not appellant intended to kill Hall at that point, his actions support a reasonable inference that he intended to take her to another place where she could not immediately escape from him. Appellant took her away from the public street, through her backyard, down into a creek area or drainage ditch, and 300 feet into a flooded concrete drainage pipe where he finally killed her. The evidence is legally sufficient to support the jury's finding beyond a reasonable doubt that appellant killed Hall in the course of committing or attempting to commit kidnapping.

■ Evidence is factually insufficient if, viewing all of the evidence in a neutral

light, "the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim. App.2000). Appellant asserts that the proof of appellant's guilt is so obviously weak as to undermine confidence in the verdict and the verdict is therefore against the great weight and preponderance of the evidence. He claims the evidence is factually insufficient for the same reasons he argued it was legally insufficient.

■ Evidence of Hall's abduction was supported by Thomas' testimony that he saw appellant carry Hall away struggling, screaming, and fighting for her life, and by Duvall's testimony that the evidence was consistent with the theory that Hall was carried through the pipe alive and killed somewhere beyond 150 feet inside the pipe. Johnson's testimony suggested that Hall might have been killed before appellant carried her down to the drainage ditch. But Johnson's testimony was just as consistent with the theory that Hall was merely knocked unconscious by appellant and was also contradicted by Duvall's medical testimony that Hall was alive when she was strangled. The evidence in support of a kidnapping is not so obviously weak as to undermine confidence in the outcome. Points of error two and three are overruled.

In his tenth point of error, appellant claims the evidence is legally insufficient to prove beyond a reasonable doubt that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Appellant argues that "nothing in the record indicates that the victim suffered any torture or other sadistic cruelty." He claims that the murder was not premeditated, the sentence he received for his previous murder conviction

was well below the maximum allowed by law, and the State's failure to present psychiatric testimony was a "noticeable hole" in its case. He also argues that there was virtually no evidence to show that he was a risk to prison society and points out that he would be eighty-six years old before becoming eligible for parole.

■ We review all of the evidence in the light most favorable to the verdict to determine whether there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See Jackson*, 443 U.S. at 318–319, 99 S.Ct. 2781. Viewed in a light most favorable to the verdict, the evidence presented at the guilt or innocence phase showed that appellant pursued a terrified Hall as she ran from him, caught her and forcibly carried her away to a concrete drainage culvert where he brutally murdered her, slamming her head and body against the concrete, and stabbing and strangling her. He stabbed Hall's son in the back when the child responded to his mother's screams. Hall's mother testified at punishment that appellant had threatened her with a hammer. In addition, appellant had pled guilty to and was convicted of murdering his previous wife in 1986. The evidence reflected that she suffered eleven stab wounds, six of which were fatal. The evidence also reflected that appellant committed the prior murder in the presence of the previous wife's children. Finally, appellant was a habitual drug user and had been unsuccessfully discharged from several substance-abuse programs while on parole. This evidence is sufficient for a rational trier of fact to conclude beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. Point of error ten is overruled.

In points of error four and five, appellant claims the trial court erred by admitting blood and hair evidence seized as a result of a warrantless search of appellant in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Texas Constitution. Appellant argues that the consent to search was not voluntary because he was asked to consent while he was receiving treatment for an injury that was causing him pain, he was under arrest at the time, he was not informed that the results of the search could incriminate him, and he was not given *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

While appellant was at Parkland Hospital having his knee examined, Detective Kenneth Penrod asked him to consent to a search for blood, saliva, and trace evidence on appellant's person. Penrod read appellant the consent form which stated in part that he had been informed of his right not to be searched or have evidence seized without a warrant, that he had been told of his right to refuse the search or seizure, and that he authorized Penrod to take samples of hair, blood, clothes, saliva, any trace evidence, and body fluids. The form further stated that he gave permission voluntarily, without threats or promises, and with his full consent. Penrod stated that appellant understood the form and was given an opportunity to ask questions. Appellant agreed to the search and signed the form. Blood was drawn and samples of evidence were taken from appellant's person.

▪ Under the Fourth and Fourteenth Amendments, a search conducted without a warrant issued upon probable cause is "per se unreasonable ... subject only to ... specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)(quoting *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576(1967)). A search conducted with the consent of the suspect is one such exception, so long as the consent is voluntary. *Schneckloth*, 412 U.S. at 219–23, 93 S.Ct. 2041. The validity of a consent to search is a question of fact to be determined from all the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim.App.2002). The federal constitution requires the State to prove the validity of the consent by a preponderance of the evidence; the Texas Constitution requires the State to show by clear and convincing evidence that the consent was valid. *Maxwell*, 73 S.W.3d at 281. At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses and their testimony. *Id.* In reviewing a trial court's ruling on a motion to suppress, we give almost total deference to a trial court's determination of historical facts, and we review *de novo* the court's application of the law. *Id.* See also *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

▪ Contrary to appellant's claims, we know of no authority that requires informing a suspect of his rights under *Miranda* before obtaining a consent to search, and appellant points to none. While the failure to inform a suspect that evidence found can be used against him may be one factor to consider, it would not automatically render his consent involuntary. See *Johnson v. State*, 68 S.W.3d 644, 653 (Tex.Crim.App.2002)(police officer's failure to inform accused that he can refuse consent does not automatically render accused's consent involuntary, but is a factor to consider). Nor is consent rendered involuntary merely because the accused is under arrest, at least when the officers'

guns are not drawn. *Id.* In *Johnson,* we held the defendant's consent to search was voluntary even though the defendant was handcuffed and arrested, no *Miranda* warnings were given, and no consent to search form was signed, because the officers' guns were not drawn, the officers were in appellant's house pursuant to a valid arrest warrant, and the initial protective sweep was legal. *Id.* at 653–654.

The evidence does not support appellant's argument that his medical treatment and condition were such that his consent was rendered involuntary. The nurse who drew appellant's blood testified that appellant was diagnosed as having a knee sprain, and was given a tetanus shot and some Motrin. He was not given or prescribed any other medication. The nurse stated that appellant was "very stoic." There was no evidence that appellant was suffering such pain that his actions were involuntary. There is no evidence showing that the atmosphere in the hospital was coercive or that the officers had their guns drawn or were otherwise threatening appellant in any way when his consent was requested. Viewing the circumstances as a whole and giving deference to the trial court's findings of historical fact, the State has shown by clear and convincing evidence that appellant's consent was voluntary. The trial court did not abuse its discretion in overruling appellant's objections to the evidence on these grounds. Points of error four and five are overruled.

In his sixth and seventh points of error, appellant claims the trial court erred by admitting into evidence autopsy photographs of the victim at the guilt or innocence phase of trial. In his eighth and ninth points of error, appellant claims the trial court erred by admitting autopsy photos at the punishment phase. Appellant argues that the inflammatory nature of these photos and their cumulative effect outweighed any probative value.

Admissibility of photographs is within the sound discretion of the trial court. *Hayes v. State,* 85 S.W.3d 809, 815 (Tex.Crim.App.2002). Rule of Evidence 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence. Rule 403 favors admissibility and contains a presumption that relevant evidence will be more probative than prejudicial. *Hayes,* 85 S.W.3d at 815. A trial court's decision will be upheld if it is within the zone of reasonable disagreement. Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself. *Id.* at 816; *Salazar v. State,* 38 S.W.3d 141, 151 (Tex. Crim.App.), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001).

Appellant objected to Exhibits 52, 53, 54, and 66 through 71. The record contains black-and-white 8½ × 11 photocopies of the exhibits, but does not reflect the size of the originals. The parties referred to a couple of the exhibits specifically as "black and white," suggesting that the others were in color. The prosecutor explained that Exhibits 52, 53, and 54 depicted various parts of the victim's head and brain, showing different injuries and taken from different angles. He stated that they were necessary to demonstrate the extent of the injuries. Exhibit 66 depicted the internal structures of the neck, including the larynx, photographed after these structures were removed from the body during the autopsy. Exhibit 67 was a magnified view of the injuries to these structures, and Exhibit 68 was a view of these injuries from a different angle. Exhibit 69 depicted the injuries to these

structures, and Exhibit 71 was a magnified view of the upper portion of 69. Exhibit 70 was another magnification of the front of the larynx. Taking these explanations into consideration, the trial court overruled appellant's objections. After his objections to these specific photos were overruled, appellant objected to "all of the autopsy photographs." The court viewed the photos and overruled appellant's blanket objection.

Jennie Duvall, the medical examiner who conducted the autopsy, testified to the injuries depicted in the photos. A contested issue at trial was whether the State had proven kidnapping, which turned in part on whether the victim was killed outside or inside of the culvert. The defense claimed that the victim was dead when carried into the culvert and that a dead body cannot be kidnapped. The State argued that the struggling victim was forced into the culvert and was killed close to where her body was found some 300 feet inside. Using the photos as an aid, Duvall explained why the evidence showed that the various injuries were inflicted while the victim was still alive. Duvall also testified to what might have caused the various injuries, which had a direct bearing on the question of where the victim was killed. In addition to addressing the location of the victim's death, the photos were helpful to the State in meeting its burden of showing an intentional killing.

While the photos may be graphic, they depict the realities of the crime committed. And, although some of the photos reflected alterations of the victim's body or organs due to the autopsy procedures, these were fully explained to the jury as necessary to a thorough examination of the injuries. The photos were not notably duplicative or cumulative, and served as an aid to Duvall's explanation of theories relevant to the State's case. The probative value of the photos was not substantially outweighed by any prejudicial effect. The trial court did not abuse its discretion in overruling appellant's objections to the photos of the victim admitted at the guilt or innocence phase of the trial.

Appellant also complains about autopsy photos admitted at the punishment phase. The State presented evidence in its case-in-chief at punishment that appellant was convicted for the 1986 murder of his previous wife. In its punishment case, the defense presented evidence of appellant's difficult childhood and testimony from Gilda Kessner, a forensic psychologist, that appellant did not pose a continuing threat or danger to society. In cross-examining Kessner, the State established that she had reviewed the autopsy photos and police reports pertaining to the 1986 murder in reaching her conclusions. Kessner noted that appellant pled guilty to that offense. On redirect examination, Kessner testified to some of the details of the 1986 murder, noting that reports reflected that the children in the house witnessed some of appellant's stabbing of his former wife. In its rebuttal case, the State presented the autopsy photographs from the 1986 murder. Appellant claims the timing of the State's presentation of these photos immediately before deliberations was calculated to inflame the jury, and argues that the probative value was slight given that the jury had already been presented with evidence that appellant had been convicted of the murder.

■■■ The State offered Exhibits 107 through 117. Some of the photos reflected the effects of emergency room intervention that was taken in an effort to revive the victim. The trial court excluded one of the photos that depicted a metal rod or "metallic probe" that was inserted during the autopsy to reflect the relationship between entrance and exit wounds. The trial court

admitted the other photos, noting that the depiction of the emergency room intervention did not overshadow the depiction of the injuries and could be explained with the proper predicate.

The photos reflected the injuries inflicted by appellant in murdering his previous wife, including eleven stab wounds. Kessner testified that the photos were among the evidence she reviewed in reaching her conclusion that appellant would not be a future danger. The photos were not more gruesome than the crime that was committed, and the effects of any emergency room intervention could be explained. The trial court did not abuse its discretion in concluding that the photos were relevant to the issue of appellant's future dangerousness, they were proper rebuttal evidence in light of Kessner's testimony, and their probative value was not substantially outweighed by any prejudicial effect. Points of error six through nine are overruled.

In his eleventh point of error, appellant claims the trial court erred in denying his challenge for cause against prospective juror Diane Potts, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Appellant points to answers Potts gave on her juror questionnaire reflecting that she was strongly in favor of the death penalty and argues that the totality of her voir dire indicated that she would automatically answer the future danger issue in the affirmative upon a finding of guilt of capital murder.

Potts stated on her juror questionnaire that she was "Absolutely!" in favor of the death penalty. When asked which statement best represented her feelings, she circled the following: "I believe that the death penalty is appropriate in some murder cases and I could return a verdict in proper [sic] case which assessed the death penalty." Potts chose this response over the previous choice: "I believe that the death penalty is appropriate in all murder cases." She also responded with "yes" to the following statement: "[D]o you agree that a life sentence, rather than the death penalty would be appropriate under the proper circumstances in some cases?" When asked whether she felt the death penalty was used too often or too seldom in Texas, Potts circled "too seldom" and explained, "I think anyone who murders another should be put to death. *Period!*" When asked how she felt about the death penalty as a punishment for crime, Potts wrote "I'm all for it."

During voir dire Potts agreed when questioned by the prosecutor that she could keep an open mind in answering the special issues, and agreed that there are some situations when capital murder might not warrant imposition of the death penalty. When questioned by defense counsel, Potts indicated that she believed any person who committed an intentional murder should receive the death penalty. The trial court then clarified the difference between murder and capital murder and discussed the range of punishment for murder. Potts agreed that she could consider the whole range of punishment in a murder case. She also agreed that she could keep an open mind during the punishment phase and hold the State to its burden of proving the future dangerousness special issue. Finally, she agreed with the court that she could give a life sentence if she felt it was the right thing to do. Appellant asserted a challenge for cause. The trial court stated that although Potts' answers on the questionnaire reflected her initial attitudes, she need only be able to follow the law, not necessarily agree with it. The court stated that Potts' voir dire as a whole reflected that she understood the law and would follow it.

The court overruled appellant's challenge for cause, and appellant utilized a peremptory strike.

 The party making a challenge for cause bears the burden of showing that the challenged venireperson will be substantially impaired in his ability to follow the law. *Clark v. State*, 929 S.W.2d 5, 8 (Tex.Crim.App.1996). A venireperson need not agree with the law as long as his personal views do not substantially impair his ability to abide by his oath and answer the special issues according to the evidence and the law. *See Riley v. State*, 889 S.W.2d 290 (Tex.Crim.App.1994) (op. on reh'g)(reaffirming principle that potential juror may not be challenged for cause based upon his views about capital punishment unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."), *cert. denied*, 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995). The trial court did not abuse its discretion in refusing to grant the challenge for cause. Examination of Potts' entire voir dire reflected that while she strongly favored the death penalty, she consistently stated that she would follow the law and would keep an open mind during punishment. Appellant has not shown that she had a bias or prejudice against the law. Point of error eleven is overruled.

In his twelfth point of error, appellant claims the death-penalty scheme violated his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues. This identical issue has been repeatedly raised and rejected. *Turner v. State*, 87 S.W.3d 111, 118 (Tex.Crim.App.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1760, 155 L.Ed.2d 519 (2003); *Jackson v. State*, 33 S.W.3d 828, 841 (Tex.Crim.App.2000), *cert. denied*, 532 U.S. 1068, 121 S.Ct. 2221, 150 L.Ed.2d 213 (2001); *McFarland v. State*, 928 S.W.2d 482, 519 (Tex.Crim.App.1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). Point of error twelve is overruled.

In point of error thirteen, appellant claims the Texas death-penalty scheme violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of trial that he claims effectively determine the difference between a life sentence and the imposition of the death penalty. Appellant complains of the failure to define "probability," "criminal acts of violence," and "continuing threat to society." We have repeatedly rejected identical claims. *Chamberlain v. State*, 998 S.W.2d 230, 237–238 (Tex.Crim. App.1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). Point of error thirteen is overruled.

In point of error fourteen, appellant claims the Texas death-penalty scheme denied him due process of law and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence mitigating against imposition of the death penalty. Appellant relies on Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994)(Blackmun, J., dissenting). We have rejected this identical argument in previous cases. *Chamberlain*, 998 S.W.2d at 238. Point of error fourteen is overruled.

In his sixteenth point of error, appellant claims the Texas death-penalty statute, which authorizes a sentence of death without requiring that the special issues be alleged in the indictment, violated his due process rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Appellant relies on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to support his argument that the special issues should have been pled in the indictment.

Appellant argues that in *Apprendi,* the United States Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the indictment and proven to a jury beyond a reasonable doubt. He claims that the Texas statute provides for a life sentence upon conviction but if the State seeks the death penalty, a separate proceeding is held to see if the sentence can be enhanced from life to death. Thus, he claims the special issues are enhancement factors which must be pled in the indictment.

 Article 37.071 § 1 provides that if a defendant is found guilty of capital murder in a case in which the State does not seek the death penalty, the punishment is life imprisonment. Section 2 provides that if a defendant is tried for a capital offense in which the State seeks the death penalty, then a separate sentencing proceeding is held "to determine whether the defendant shall be sentenced to death or life imprisonment." Thus, when the State is seeking the death penalty, the prescribed statutory maximum is death. It is not an "enhancement" of the prescribed maximum sentence of life; it is an alternative available sentence. We have stated previously:

> *Apprendi* applies to facts that increase the penalty beyond the "prescribed statutory maximum." Under Article 37.071,

the statutory maximum is fixed at death. There are no statutory enhancements. A positive jury finding on the mitigation issue does not have the potential of increasing the penalty; rather, it has the potential to reduce a defendant's sentence.

*Resendiz v. State,* 112 S.W.3d 541, 550 (Tex.Crim.App.2003). *Apprendi* does not compel the State to allege the special issues under Article 37.071 in the indictment. Point of error sixteen is overruled.

 In his seventeenth point of error, appellant claims the Texas death-penalty statute placed the burden of proof on appellant to show that his life should be spared due to mitigating circumstances, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Appellant argues that under *Apprendi,* 530 U.S. at 476, 120 S.Ct. 2348 and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the State should bear the burden of proving beyond a reasonable doubt that there is insufficient mitigation evidence to support a life sentence.

In *Resendiz,* 112 S.W.3d at 550, we rejected the defendant's claim that *Apprendi* requires the State to bear the burden to prove beyond a reasonable doubt that the mitigation issue should be answered in the negative. We said the defendant was reading *Apprendi* too broadly, for the reasons set forth in the previous point of error. We also noted that "with respect to appellant's claim the State should bear the burden of proof as to mitigation, *Apprendi* does not address this burden."

Nor does *Ring* support appellant's argument. Appellant relies on the following passage from *Ring* to support his argument that the State should bear the burden of proof on the mitigation issue:

[U]nder the due process clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, *any fact* (other than prior conviction) *that increases the maximum penalty for a crime must be* charged in the indictment, submitted to a jury, and *proven beyond a reasonable doubt.*

*Ring,* 536 U.S. at 600, 122 S.Ct. 2428 (quoting *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999))(emphasis added by appellant). This passage, like *Apprendi,* refers to an increase in penalty *over the statutory maximum.* In Texas, the statutory maximum for a capital offense is death. The mitigation issue does not increase the statutory minimum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum. Point of error seventeen is overruled.

■ In point of error nineteen, appellant claims the Texas death-penalty statute violated his due process rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by failing to require the State to prove beyond a reasonable doubt that appellant is dangerous. He argues that a finding that there was a "probability" that appellant would be a continuing threat is constitutionally deficient. He again relies on *Apprendi* and *Ring* as mandating a finding of future dangerousness beyond a reasonable doubt. As stated in the previous points of error, *Apprendi* and *Ring* have no applicability to Article 37.071 in its current form. In addition, we have held that the inclusion of the term "probability" does not render the future dangerousness special issue unconstitutional. *Robison v. State,* 888 S.W.2d 473, 481 (Tex.Crim.App.1994), *cert. denied,* 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). The State must still prove *beyond a reasonable doubt* that there is a probability that the defendant will be a continuing threat to society. *Id.* This is constitutionally sufficient. *Id.* Point of error nineteen is overruled.

In point of error twenty-one, appellant claims the Texas death-penalty statute, which allows the State unfettered discretion in deciding to seek the death penalty, violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Appellant argues that the lack of consistent standards among various prosecuting offices around the State renders the system arbitrary and capricious. We have previously rejected such arguments. *Ladd v. State,* 3 S.W.3d 547, 574 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *McFarland,* 928 S.W.2d at 510–511. Point of error twenty-one is overruled.

In points of error fifteen, eighteen, twenty, and twenty-two, appellant makes the same claims under the Texas Constitution as he makes in other points of error under the federal constitution. Because appellant does not provide separate argument and authority for these claims under the Texas Constitution, he has waived them. *Heitman v. State,* 815 S.W.2d 681, 690 n. 22 (1991). Points of error fifteen, eighteen, twenty, and twenty-two are overruled.

In points of error twenty-three and twenty-four, appellant claims the cumulative effect of the above-enumerated constitutional errors violated his rights under the state and federal constitutions. We have found no constitutional errors. *Chamberlain,* 998 S.W.2d at 238 (stating that non-errors may not in cumulative effect cause error). Points of error twenty-three and twenty-four are overruled.

The judgment of the trial court is affirmed.

JOHNSON, J., concurs in point of error number 11 and otherwise joins the opinion of the Court.