COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| ALEJANDRO MORAN, | | No. 08-10-00284-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | Criminal District Court No. 1 |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20080D03281) |
| | § | |

**O P I N I O N**

Alejandro Moran appeals his conviction of possession of more than 50 but less than 2,000 pounds of marihuana. He waived his right to a jury trial and entered a negotiated plea of guilty. In accordance with the plea bargain, the trial court sentenced Appellant to imprisonment for five years. Finding no error in the denial of his pretrial motion to suppress, we affirm the judgment of the trial court.

**FACTUAL SUMMARY**

Appellant filed a pretrial motion to suppress alleging the evidence was seized without a warrant. The evidence showed that members of the El Paso Police Department's Narcotics Unit were conducting surveillance in the parking lot of a Home Depot in El Paso when Detective Fernie Carrasco observed a male emerge from a blue Kia in the parking lot and walk over to a male and female standing in front of the Home Depot. The male handed some car keys to the couple and they walked over to the Kia, got in the car, and left the parking lot. The male got into a black Lincoln and left the parking lot as well. Other police officers, including Lieutenant Kyle

Summers, followed the blue Kia and stopped it for a traffic violation. The officers found approximately 80 to 100 pounds of marihuana in the car.

Later that day, Summers and K-9 Officer Gabriel Corral went to 12544 Angie Bombach in El Paso to conduct a knock-and-talk. Detective Lawrence had been conducting surveillance on the residence for three hours prior to their arrival. Carrasco was also present. As they approached the house, Summers observed a black Lincoln Town Car matching the description of the car Carrasco had observed at Home Depot earlier that day. Summers also saw two men standing in front of 12536 Angie Bombach. He made eye contact with the men and continued walking towards the front door. As they walked by the garage, Corral's drug dog, Barry, alerted at the garage door and Detective Lawrence began knocking on the front door, but no one answered. At the same time, Carrasco informed Summers by radio that the man he had observed drop off the blue Kia at the Home Depot was one of the men the officers had seen standing in front of 12536 Angie Bombach when they arrived. Carrasco told him that the man had just started walking toward the backyard of the neighboring house. Believing the man was trying to escape, Summers jogged over to the house and was joined by Carrasco. They found the man, subsequently identified as Appellant, crouched down behind a wall. Both Carrasco and Summers identified themselves as police officers and told Appellant they were conducting a narcotics investigation. Appellant told them that he lived at 12544 Angie Bombach. The officers did not make physical contact with Appellant or display their weapons. Summers asked Appellant if they could go back to his house to talk to him about the investigation and Appellant agreed. Once they arrived at the front of the residence, Detective Lawrence identified himself as a police officer. Appellant told Lawrence that he lived at the residence. Lawrence asked Appellant whether they could go inside the residence and talk about an investigation they were

2

conducting and Appellant agreed. Appellant opened the door and Lawrence went inside with him. Lawrence told Appellant that the police had been given information that there were drugs at the residence and Appellant told him that there were boxes of drugs inside of the garage. When Lawrence asked if they could go in the garage, Appellant led the way. Appellant opened the door and they entered the garage together. Lawrence could smell marihuana and he saw several boxes stacked up in the garage and covered with towels. Lawrence asked Appellant if he could look inside one of the boxes and Appellant told him yes. Lawrence opened one of the boxes and found bundles of marihuana. The officers advised Appellant of his rights and Lawrence asked him if he would make a statement. Appellant agreed and he made a recorded statement claiming full responsibility for the marihuana in his home.

Appellant's neighbor, Hector Salas, testified for the defense at the suppression hearing. Salas lived at 12536 Angie Bombach in June of 2008 when the events giving rise to Appellant's arrest took place. Salas's neighbor, Alejandro Galindo, told him that the police were in his backyard so Salas went outside and spoke to the police. He saw Appellant on his knees. At first, Salas said Appellant's hands were behind his back and later he said that Appellant's hands were on top of his head. After a few minutes, he saw the officers walking with Appellant to his house. He initially said that Appellant was not in handcuffs but he added that he was not sure whether Appellant had been handcuffed. He thought Appellant's hands might have been behind his back or the officers might have had him by the shoulder as they walked away.

Appellant's wife, Sandra Moran, testified that she was at a movie theater when she was approached by police officers who asked to speak with her outside. They told her that she had to leave her car at the theater and go with them to her house. When they arrived at her house, she saw a lot of people, including men in ski masks in her garage. The officers showed her the

3

marihuana contained in the boxes in the garage. The officers took her into the living room and told her that she was going to be arrested and their children taken to Child Protective Services because drugs had been found in the house, but she would not be arrested if her husband cooperated with the police. Appellant was in the living room with her when these statements were made and afterwards the officers took him into a bedroom. After about forty minutes, the officers arrested her husband. During cross-examination, Ms. Moran admitted that the officers had not threatened or coerced her and they had not displayed their weapons.

Appellant testified that he was in his neighbor's backyard when he saw five to seven police officers come into the yard. He admitted that he had walked into the backyard when he saw officers at his house and he crouched down although he "didn't exactly hide." One of the officers pointed his weapon at Appellant and ordered him to drop to his knees and put his hands behind his neck. The officers asked Appellant if he had any weapons and they searched him. One of the officers was going to handcuff Appellant but another officer told him not to do that. In response to the officers' questions, Appellant told them his name and where he lived. When they got back to Appellant's house, Appellant saw masked men leaving his home. One of the officers asked Appellant if they could go inside and Appellant asked him whether he had a warrant. The officer replied that he did not but he could get one and it would be better for Appellant if he cooperated. The officer also threatened to arrest Appellant's wife and take their children to Child Protective Services, so Appellant agreed to let them enter the house. Appellant disagreed with Detective Lawrence's testimony regarding consent to search the garage. Lawrence asked him whether he had drugs in the garage and Appellant replied that there were boxes in the garage but he did not know what they contained. Lawrence then asked Appellant if the boxes contained cocaine or marihuana and Appellant replied that he did not know. When

4

Lawrence asked if they could "go check", Appellant agreed and they went into the garage. Appellant denied ever touching the boxes or knowing what was in them. Lawrence cut open one of the boxes and found marihuana.

In the written findings of fact and conclusions of law, the trial court found that the encounter between the officers and Appellant was consensual; Appellant voluntarily consented to the officers entering his house and searching the boxes in the garage; and Appellant told Detective Lawrence in the videotaped statement that he was never threatened and weapons were not pointed at him when he gave the officers consent to search his home. The trial court denied the motion to suppress.

## CONSENT TO SEARCH

In his sole issue on appeal, Appellant contends that the trial abused its discretion by concluding that Appellant voluntarily consented to search. Appellant's voluntariness issue is based on the Fourth Amendment as well as Article 1, Section 9 of the Texas Constitution.

At a suppression hearing, the trial judge is the sole trier of fact as to the credibility and weight to give witness testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex.Crim.App. 2007). As such, the trial judge may choose to accept or reject any or all of the testimony offered. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Peralta v. State*, 338 S.W.3d 598, 607 (Tex.App.--El Paso 1994, no pet.). We do not engage in our own factual review of the trial court's decision. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex.Crim.App. 2000).

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador*, 221 S.W.3d at 673; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility

and demeanor, but we review *de novo* application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005). When a trial court expressly finds facts in ruling on a motion to suppress, a reviewing court views the evidence in a light most favorable to the trial court's ruling and determines whether the evidence, when viewed in that light, supports the fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). The appellate court then reviews the trial court's legal ruling *de novo* unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling. *Id.*

Under the Fourth and Fourteenth Amendments to the United States Constitution, a search conducted without a warrant issued with probable cause is per se unreasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Id*. at 219, 93 S.Ct. at 2043-44; *Guevara v. State*, 97 S.W.3d 579, 582 (Tex.Crim.App. 2003). The test for a valid consent to search requires the consent to be voluntary, and voluntariness is a question of fact to be determined from all the circumstances. *Schneckloth*, 412 U.S. at 248-49, 93 S.Ct. at 2059; *Guevara*, 97 S.W.3d at 582. To be valid, consent to search must be positive and unequivocal and must not be the product of duress or coercion, either express or implied. *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex.Crim.App. 2000). The federal constitution requires the State to prove the validity of the consent by a preponderance of the evidence, while the Texas Constitution requires the State to make the same showing by clear and convincing evidence. *Guevara*, 97 S.W.3d at 582. Accordingly, we review the evidence under the more protective Texas standard. *See State v. Ibarra*, 953 S.W.2d 242, 244-45 (Tex.Crim.App. 1997).

6

Voluntariness of consent is determined by looking at the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App. 2000), *citing Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2041. By looking at the circumstances leading up to the search, the reaction of the accused to pressure, and any other factor deemed relevant, a trial court can determine whether the statement of consent was given voluntarily. *Id.* In determining voluntariness, the factors considered by the court include: (1) whether the consenting person was in custody; (2) whether the person was arrested at gunpoint; (3) whether the person had the option of refusing consent; (4) the constitutional advice given to the person; (5) the length of detention; (6) the repetitiveness of the questioning; and (7) the use of physical punishment. *Id.* Courts may also consider the consenting person's age, education, and intelligence. *Id.*

Appellant asserts that the State failed to prove that his consent was voluntary because the officers took him into custody at gunpoint, entered his home before they obtained consent, threatened to arrest Appellant's wife and take his children to Child Protective Services if he did not cooperate, and failed to advise Appellant of his *Miranda* rights. Appellant's argument fails to take the evidence in the light most favorable to the trial court's determination that the encounter between Appellant and the police was a consensual one and Appellant freely and voluntarily consented. Further, the trial court's findings reflect that the court did not find credible the defensive evidence offered at the suppression hearing.

The evidence supports the trial court's determination that the encounter between the Appellant and police was a consensual one. The trial court believed the officers' testimony that they did not draw their weapons or place Appellant in any kind of physical restraint when they talked to him in the neighbor's backyard or when they asked him for consent to search his house.

7

The evidence also shows that the officers spoke to Appellant for only a couple of minutes before he admitted that he had marihuana in the garage and consented to the search. Thus, he was not subjected to a lengthy detention or repeated questioning. The record does not reflect that Appellant was advised he did not have to consent but this is not fatal to a finding of voluntariness. *See Johnson v. State*, 68 S.W.3d 644, 653 (Tex.Crim.App. 2002)(stating that although a police officer's failure to inform an individual that he can refuse consent is a factor to consider, the absence of such information does not automatically render the consent involuntary). Likewise, the officers' failure to administer *Miranda* warnings prior to requesting consent is a factor to be considered in examining the totality of the circumstances, but it does not automatically render the consent involuntary. *See Rayford v. State*, 125 S.W.3d 521, 528 (Tex.Crim.App. 2003). We conclude that the evidence supports the trial court's fact findings that the officers did not obtain Appellant's consent by force, coercion, or by threat, and Appellant voluntarily consented to the officers' entry into his home and to the search of the boxes in the garage. *See Johnson*, 68 S.W.3d at 653 (defendant's consent to search his residence was voluntary, even though defendant had not been told he had right to refuse consent; defendant was under arrest at time consent was given but officers did not arrest defendant with guns drawn, defendant guided officers to location of room in which defendant slept, no threats were made to defendant in order to get defendant's consent). We overrule the sole issue presented and affirm the judgment of the trial court.


February 1, 2012 _____
ANN CRAWFORD McCLURE, Chief Justice


Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)