**Affirmed and Memorandum Opinion filed August 22, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00781-CR

---

### AMBER ORLEAN WILLEMSEN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 149th District Court
Brazoria County, Texas
Trial Court Cause No. 79307-CR**

---

## MEMORANDUM OPINION

A jury found appellant Amber Orlean Willemsen guilty of the felony offense of intoxication manslaughter and assessed her punishment at confinement for 32 years. In two issues, appellant contends that the trial court erred in (1) instructing the jury regarding intoxication by a drug, a dangerous drug, or a combination of two or more substances in her body when the evidence did not support that instruction, and (2) denying her motion to suppress blood-test results because the

State failed to prove by clear and convincing evidence that she voluntarily consented to provide a blood specimen.

We affirm.

## *Background*

Around 3 a.m. on June 12, 2016, Officer Endy Ekpanya of the Pearland Police Department was responding to a call about a noise disturbance when a car driven by appellant collided with his patrol car. Ekpanya died from injuries he sustained in the collision. Evidence showed that at the time of the collision, appellant's car was speeding and travelling in the wrong lane of traffic. First responders at the scene noted that appellant was acting abnormally, seemed detached, and showed signs of intoxication. She was taken to a hospital for treatment of her injuries. While there, her blood was drawn and sent for testing.

During the hearing on appellant's pre-trial motion to suppress blood-test results, State Trooper Darien Norman testified that after he placed appellant under arrest, she consented freely and voluntarily to a blood draw. He acknowledged, however, that appellant said that she was in pain and what she had experienced that night may have impacted her ability to understand what he was asking of her.[1]

Nurse Lindsay Katt, who drew appellant's blood for testing, stated that Trooper Norman did not use threats or coercion to obtain appellant's consent. Katt further stated that although appellant had received pain medication prior to her arrival at the hospital, such medicine, in Katt's experience, did not alter a patient's mental state.

---

[1] Appellant's injuries were not comprehensively discussed during the hearing, but she appears to have had at least an injury to her leg that involved her knee and an injury to one of her hands. She was apparently strapped to a back board when brought into the emergency room but was no longer attached to it at the time Trooper Norman sought her consent for the blood specimen.

State Trooper Nicolas Gassiott testified that he subsequently obtained written consent from appellant for the blood draw. He stated that appellant signed the consent freely and voluntarily and she told him that she had previously orally consented to the blood draw. Gassiott acknowledged, however, that she seemed "very confused" and was having trouble answering basic questions.

Appellant testified that when she was at the hospital, she was in great pain, was very drowsy, and felt "drugged up." She remembered someone asking for a blood sample, but she did not recall saying "yes." Appellant remembered an officer reading her legal rights to her, but she didn't really understand them at the time. She said that she was confused and in agony, and she did not believe that she freely and voluntarily consented to a blood draw.

After the trial court denied appellant's pre-trial motion to suppress blood-test results, the case proceeded to trial. The State offered and the trial court admitted into evidence the blood-test results which showed that on the night of the collision, appellant had a blood-alcohol concentration of between 0.139 and 0.163 grams of alcohol per 100 milliliters of blood. Other evidence that appellant was intoxicated on the night of the collision included her statements that she had consumed several alcoholic drinks that night, a surveillance videotape recording from the club where she worked, a videotape recording of her purchasing alcohol at a liquor store, testimony that alcohol was found in a liquor bottle and a plastic water bottle in her car, and observations from several witnesses about her demeanor and appearance on the night of the collision.[2]

Appellant's blood also testified positive for the presence of Sertraline, an

---

[2] The liquor store videotape recording and a corresponding receipt showed that appellant purchased a bottle of vodka at around 6:23 p.m. the night of the collision. Subsequent analysis of the bottle found in appellant's car indicated that approximately 7 ounces of vodka were missing.

anti-depressant medication commercially known as Zoloft. The toxicologist who conducted the testing stated that he only tested for the presence of the drug, not the amount of the drug in appellant's bloodstream; thus, the toxicologist could not say whether the drug was present at a level that would have affected appellant. However, a bottle of Sertraline was found in appellant's purse after the collision. On the bottle was a warning label stating: "May cause drowsiness. Taking this medicine along with alcohol may lessen the ability to drive or perform hazardous tasks."

In its charge, the trial court instructed the jury that it should find appellant guilty of intoxication manslaughter if the jurors:

> believe[d] from the evidence beyond a reasonable doubt, that [appellant] operate[d] a motor vehicle . . . while intoxicated and did by reason of such intoxication cause the death of Endy Ekpanya, a peace officer in the actual discharge of an official duty, by accident or mistake, by causing said motor vehicle to collide with a vehicle occupied by Endy Ekpanya.

The trial court defined "[i]ntoxicated" over appellant's objection as meaning "either (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a drug, a dangerous drug, or a combination of two or more of those substances into the body or (2) having an alcohol concentration of 0.08 or more."[3] As noted above, appellant had previously argued that the evidence did not support the submission of intoxication by anything other than alcohol.

### *Jury Instructions*

In her first issue, appellant contends that the trial court erred in instructing the jury regarding intoxication by a drug, a dangerous drug, or a combination of

---

[3] This definition is derived from Texas Penal Code section 49.01(2), which also adds "a controlled substance" to the list in the loss of faculties option. The trial court amended the definition to omit "a controlled substance" at appellant's request.

4

two or more substances in her body because the evidence only supported an instruction regarding intoxication by alcohol.[4]

A jury charge must set forth the law applicable to the case. Tex. Code Crim. Proc. art. 36.14; *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004). The trial court is required to fully instruct the jury on the law applicable to the case and to apply that law to the facts presented. *Gray*, 152 S.W.3d at 127. It is not enough for the charge to merely incorporate the allegations in the charging instrument; it must also apply the law to the facts adduced at trial. *Id*. Although the trial court is required to include statutory definitions in the charge that affect the meaning of the elements of the crime, the charge must be tailored to the facts presented at trial. *See Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *see also Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017). Specifically, in cases such as this, the "trial court must submit to the jury only the portions of the statutory definition of 'intoxicated' that are supported by the evidence. To do otherwise is error." *Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017).

In both *Burnett* and *Ouellette*, the Court of Criminal Appeals grappled with the question of whether a trial court erroneously instructed a jury that it could convict a defendant if it found that he or she was intoxicated by reason of the introduction of something other than just alcohol into his or her system. The Court concluded that there was no charge error in *Ouellette* but that there was error under

---

[4] The State suggests that appellant failed to preserve her first issue for appellate review because her counsel at one point clarified his objection and then subsequently did not object when the final version of the charge was provided to the attorneys. However, it appears clear in the record that counsel made an objection to the inclusion of substances other than alcohol in the definition of intoxication, and the judge agreed to remove "a controlled substance" from the definition but expressly refused to remove the other nonalcohol substances. Counsel therefore preserved the issue brought on appeal and did not somehow undo that preservation by making an additional argument and then not objecting again when the final version of the charge was provided to the attorneys. It is clear from the context that the trial court understood the objection and expressly denied it in relevant part.

the circumstances in *Burnett*.

The defendant in *Ouellette* was charged with driving while intoxicated after rear-ending another car. 353 S.W.3d at 868-69. There was evidence that the defendant showed signs of intoxication and had consumed alcohol near the time of the collision, but the police also found three different types of pills in the defendant's car including Soma. *Id*. at 369. An officer testified at trial that Soma, like alcohol, is a central nervous system depressant that could cause symptoms like those seen when the defendant was administered a horizontal-gaze nystagmus test after the collision. *Id*. The defendant told the officer that she had not taken the medications in over a month, and she initially offered to provide a blood sample but then retracted the offer when told the test could also be used to determine her blood-alcohol concentration. *Id*.

In rejecting the defendant's contention that there was no evidence she was intoxicated by anything other than alcohol, the Court first noted that the DWI statute focuses on "the state of intoxication not the intoxicant." *Id*. The Court then explained that circumstantial evidence indicated the defendant showed signs of having ingested a central nervous system depressant, which could include both alcohol and the medication found in her vehicle. *Id*. at 870. The Court concluded that while the evidence the defendant "was intoxicated by drugs was circumstantial and not obviously overwhelming, it [was] nonetheless present in the record." *Id*. Although there was no direct evidence the defendant consumed the drug, there was evidence from which the jury could have concluded she did; accordingly, the trial court did not err in instructing the jury on intoxication by consumption of drugs. *Id*.

The defendant in *Burnett* was also charged with DWI after rear-ending another vehicle. 541 S.W.3d at 78. There was evidence the defendant was

6

intoxicated due to alcohol consumption. *Id*. at 78-9. Pills were also found in appellant's vehicle and his jacket pocket. *Id*. at 79. Although there was speculation in the record that the pills might have been hydrocodone, the Court emphasized that there was "no evidence . . . as to what kind of drug hydrocodone is, whether it can cause intoxicating effects, or whether the symptoms of intoxication [the defendant] was experiencing were also indicative of intoxication by hydrocodone." *Id*. at 84. The Court further explained that:

> The jury is permitted to consider whether a defendant was intoxicated from "any other substance" when there is evidence that the defendant ingested a substance that caused him to become intoxicated or there is sufficient evidence for a rational juror to infer such. But . . . the record here does not support that *Burnett* ingested a substance other than alcohol.

*Id*. In the absence of any evidence of intoxication by a substance other than alcohol, the trial court in *Burnett* erred in instructing the jury on intoxication by consumption of drugs. *Id* at 85.

The instant case presents circumstances that are closer in line with *Ouellette* than *Burnett*, but, here, the evidence that appellant was intoxicated due to the ingestion of drugs is stronger than the evidence against the defendant in *Ouellette*. Most notably, the testing of appellant's blood after the collision indicated the presence of the anti-depressant Sertraline in her system, and a bottle of Sertraline found in her purse had a warning label on it that stated: "May cause drowsiness. Taking this medicine along with alcohol may lessen the ability to drive or perform hazardous tasks." *See Murry v. State*, 46 Tex. Crim. 128, 130, 79 S.W. 568, 569 (1904) (holding warning labels on bottles constituted evidence defendant had notice of intoxicating contents in prosecution for illegally selling intoxicating beverages); *Zapien-Garcia v. State,* No. 03-17-00779-CR, 2019 WL 2308590, at *4 (Tex. App.—Austin May 31, 2019, pet. dism'd) (mem. op., not designated for

7

publication) (holding State's closing argument about medications found in defendant's car and their potential impact on his intoxication was arguably summation of and reasonable deductions from evidence of prescription bottles with labels warning against taking them with alcohol); *Bryant v. State*, No. 02-08-294-CR, 2010 WL 2813494, at *9 (Tex. App.—Fort Worth July 15, 2010, no pet.) (mem. op., not designated for publication) (holding evidence defendant took medication on day of arrest and pill bottle bore label warning not to consume alcohol with medication sufficient to support DWI conviction); *Shaffer v. State*, 184 S.W.3d 353, 362 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding trial court did not err in admitting medicine label as proof of contents in medicine).

Here, the toxicologist who conducted the testing explained that he only tested for the drug's presence and not the amount in appellant's bloodstream. Thus, he could not say whether the drug was present at a level that would have affected appellant. However, there was substantial evidence presented that appellant was intoxicated. To begin with, there was evidence that she caused a fatal collision with a police car by driving her car on the wrong side of the road at a speed well beyond the posted limit. Additionally, witnesses described her after the collision as acting abnormally and detached, having bloodshot eyes, slurred speech, and slow reaction times.

Based on this evidence, the jury could have reasonably concluded that on the night of the collision, appellant was intoxicated by a drug, a dangerous drug, a combination of two or more substances in her body, or by alcohol alone. *See Burnett*, 541 S.W.3d at 84-85; *Ouellette*, 353 S.W.3d at 870. Accordingly, we hold that the trial court did not err in submitting such an instruction in the jury charge. *See Gray*, 152 S.W.3d at 127.

We overrule appellant's first issue.

### *Motion to Suppress*

In her second issue, appellant asserts that the trial court erred in denying her pre-trial motion to suppress blood-test results because the State failed to prove by clear and convincing evidence that she voluntarily consented to providing a blood sample. She further argues that she could not have freely and voluntarily consented to the blood draw because at the time her consent was requested, she was suffering from the mental and physical strains of a traumatic collision, severe physical injuries, sleep deprivation, and the effects of medication.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We afford almost total deference to the trial court's determination of historical facts, provided that those determinations are supported by the record. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011). We review de novo the trial court's application of law to those facts. *Valtierra*, 310 S.W.3d at 447. When, as here, the trial court makes no findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings that support its ruling. *Id*. We will uphold the trial court's ruling unless it is clearly erroneous. *Id*.

The Fourth Amendment to the United States Constitution safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV; *see also* Tex. Const. art. I, § 9. Taking a blood specimen constitutes a search and seizure under the Fourth Amendment. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). Courts deem a search conducted without a warrant per se unreasonable unless the search falls within an exception. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App.

9

2012). The State has the burden of proving that a warrantless search falls within an exception to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). Courts recognize voluntary consent to search as an exception to the warrant requirement. *Id.* For consent to be voluntary, it must be given freely and voluntarily. *See Fienen v. State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012). Courts deem consent involuntary if the individual's will has been overborne and her capacity for self-determination critically impaired. *See id.*

The validity of consent is a question of fact, and the State must prove voluntary consent by clear and convincing evidence. *See id.* In determining voluntariness of consent, the trial court must consider the totality of circumstances. *See id.* The court "must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent to search was voluntary or coerced." *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011). At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses and their testimony. *Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003). Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

At the suppression hearing, Trooper Norman testified that before obtaining appellant's consent for the blood draw, he read appellant her DIC–24 statutory warnings. These warnings explain, among other things, some of the potential consequences of refusing or submitting to a breath or blood test. *See Freeman v. State*, 413 S.W.3d 198, 203 n.1 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing Tex. Transp. Code § 724.015). Norman stated that after he placed appellant under arrest, she consented freely and voluntarily to the blood draw and appeared to be fully aware of what he said and meant. Nurse Katt observed appellant consent

10

to the blood draw, noting that Norman was professional in dealing with her and did not threaten or coerce her. Trooper Gassiott testified that appellant signed a written consent for the blood draw freely, voluntarily, and without hesitation. And she informed him that she had previously orally consented to the blood draw. Appellant herself recalled being read her legal rights, saying that she understood them, and comprehending that she was being asked for a sample of her blood. She also remembered "signing something" at some point. Additionally, Friendswood Police Department Sergeant Anthony Aprile testified that he arrested appellant in 2011 for DWI and, during that arrest, he read her the DIC-24 warnings. And she gave free and voluntary consent at that time to providing blood and breath samples.

Appellant, however, additionally asserted at the hearing that she didn't fully understand her rights when they were read to her, was in great pain, was very drowsy, and felt "drugged up." She remembered being asked for a blood sample but did not recall saying "yes." She said that she was confused and in "agony," and she did not believe that she freely and voluntarily consented to a blood draw. Other witnesses at the hearing also noted appellant's condition. Norman acknowledged that when he spoke with her at the hospital, she was lying on a gurney, seriously injured, and in pain. He further admitted that her ability to understand him could have been impacted by what she had gone through. Katt also noted appellant's injuries, explaining that appellant did not seem to know why she was at the hospital. Katt further noted that although appellant was on pain medication, it would not have altered her mental state. Gassiott said that appellant signed the consent form with her nondominant hand because her dominant hand was injured. He noted that she seemed very confused and seemed to "not know much" about what was happening. He further stated that she seemed to be having trouble answering basic questions.

11

In sum, the trial judge was presented with conflicting evidence about whether appellant freely and voluntarily consented to the blood draw. As sole judge of the credibility of the witnesses, the judge was free to discount appellant's testimony. *See, e.g., Rayford*, 125 S.W.3d at 528; *Sanchez v. State*, No. 14-14-00638-CR, 2016 WL 3131639, at *3 (Tex. App.—Houston [14th Dist.] June 2, 2016, no pet.) (mem. op., not designated for publication). The circumstances at the time appellant gave her consent for the blood draw were certainly far from ideal, but they were not such that she would not clearly have been able to freely and voluntarily consent. The witnesses testified that she did so, and appellant herself acknowledged understanding and responding to certain statements and requests made to her on the night in question, just not the request for a blood specimen. Additionally, the evidence that appellant told Gassiott that she had already consented to the blood draw to Norman suggests that she was aware of what she was doing. Giving the conflicting nature of the evidence, we defer to the trial court on the determination of consent. *See Fienen*, 390 S.W.3d at 333; *Woodard*, 341 S.W.3d at 410. Accordingly, we hold that the trial court did not err in denying appellant's pre-trial motion to suppress blood-test results.

We overrule appellant's second issue.

### *Conclusion*

We affirm the trial court's judgment.

/s/    Frances Bourliot
Justice

Panel consists of Justices Jewell, Bourliot, and Jennings (Senior Judge, First Court of Appeals, retired, sitting by assignment).

Do Not Publish — TEX. R. APP. P. 47.2(b).