

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00607-CR

Sarah M. **SIFUENTES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR13036A
Honorable Philip Kazen, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Catherine Stone, Chief Justice
    Marialyn Barnard, Justice
    Luz Elena D. Chapa, Justice

Delivered and Filed:  July 3, 2013

AFFIRMED

A jury convicted appellant Sarah M. Sifuentes of injury to a child by omission.  Based on the jury's recommendation, the trial court sentenced Sifuentes to confinement for nineteen years in the Texas Department of Criminal Justice–Institutional Division.  On appeal, Sifuentes raises nine points of error, challenging the admission of certain evidence.  We affirm the trial court's judgment.

## Background

Paramedics, including Officer Stacey Casburn, were dispatched to a home where they found a two-year-old female, C.G., on the floor. Officer Casburn testified that when he arrived, C.G. was not breathing and had no heartbeat or pulse. The officer told the jury the child was pale, bruised all over her body, and had a deformity in her arm. Resuscitation attempts were unsuccessful. Officer Casburn stated they placed C.G. into an ambulance and took her to the hospital. C.G. died.

Detective John Doyle was dispatched to Methodist Hospital to investigate C.G.'s death. Detective Doyle testified C.G. had "bruises all over her body." He took photographs of C.G. at the hospital.

The record shows that at the time of the event, a man, a woman, and several children were at the home. The woman, Sifuentes, identified herself as C.G.'s aunt; however, it was later learned Sifuentes was not C.G.'s aunt, but a friend of C.G.'s mother, Crystal. The man was identified as Sifuentes's husband, Marc Valadez. Crystal, her children, and later her husband, had, at times, lived with Sifuentes. When asked what happened to C.G., Sifuentes said the child was sick so she gave her some medicine and then left the room for several minutes. Sifuentes stated when she came back into the room, C.G. was unresponsive.

In addition to firefighters and paramedics, a San Antonio patrol officer, Luis Guzman, was dispatched to the home regarding an injured child. Officer Guzman testified the home was filthy, covered in trash – food containers, beverage containers, chicken bones, etc.[1] As for the child,

---

[1] The officer testified that after paramedics took C.G. to the hospital, he called and asked that homicide detectives be sent to the home. When he learned they would not arrive immediately, he left the home and waited outside, ensuring that no one entered. Officer Guzman testified that when the homicide detectives arrived approximately forty-five minutes later, the home had been cleaned.

Officer Guzman testified she was covered in bruises. He specifically stated she was so bruised she was "spotted, looked like a leopard."

Carrie Wilcoxson, a night unit investigator for Child Protective Services ("CPS"), was called by police. When Wilcoxson learned C.G. was deceased and had a four-year-old brother, A.G., who was still at the home, she went to the home. When she arrived, Wilcoxson discovered A.G. was not at the home, but was in a home belonging to Sifuentes's brother. Wilcoxson was then escorted by police to the brother's home. Once there, she assessed A.G. for injuries or other signs of abuse or neglect. She also assessed four other children found in the home. These four children were Sifuentes's biological children. Wilcoxson noticed A.G. had blood at the bottom of his nose, blood near his right ear, and red marks in the white part of his eye. He also had multiple scratch marks on his neck and bruising on his lower legs. A.G.'s clothing was "very dirty." In contrast, Sifuentes's children appeared uninjured and clean. Although Wilcoxson was denied permission to take A.G. into CPS custody, a police sergeant refused to leave him with Sifuentes and took the boy to the hospital.

Upon investigation, it was discovered that C.G. and A.G. were in the temporary custody of Sifuentes while their mother, Crystal, was incarcerated.[2] Sifuentes told police she had custody of C.G. and A.G. for approximately eight months before C.G.'s death. Crystal signed a power of attorney that gave Sifuentes authority to look after the children. This also allowed Sifuentes to receive food stamps and Medicaid on behalf of the children. Initially, Sifuentes kept Crystal apprised of the children's condition, telling her the children were well. However, Sifuentes

---

[2] According to Crystal, the original plan was for Sifuentes to take care of Crystal's youngest child, and C.G. and A.G. would be cared for by Crystal's relatives. However, the plan fell through and the two older children were taken by their biological father. The father was unable to care for the children, prompting an investigation by CPS. Sifuentes offered to take C.G. and A.G., and Crystal agreed to the arrangement, allowing Sifuentes to take temporary custody of the two older children. Crystal testified she wished to avoid further inquiry by CPS as she had been investigated before by the agency. The biological father stated C.G. and A.G. were clean and healthy when he took them from Crystal and surrendered them to Sifuentes.

ultimately broke off contact with Crystal–no more letters or phone calls–when Crystal was moved from the jail to a prison facility. Crystal was in prison when she learned C.G. had died; C.G.'s biological father was also in jail at the time of her death.

Sifuentes was questioned by police. When asked about the bruises on C.G., Sifuentes told the detective, Randy Jones, her only explanation was that her autistic son was responsible. She said she only noticed bruises on C.G.'s back, but she denied seeing any bruises on her chest or face. Sifuentes said the bruises on the chest must have been caused by their CPR attempts prior to the arrival of paramedics. With regard to the broken arm, Sifuentes denied knowing it was broken. She claimed C.G.'s bloody lip was caused by C.G. biting her own lip while she was eating. Sifuentes said she noticed C.G. was "throwing up" and running a slight fever, so she gave her liquid Benadryl and Motrin for infants. Thereafter, C.G. stopped throwing up. However, Sifuentes said she noticed C.G. was "staring" and would not respond. Sifuentes picked her up and soon after, C.G. stopped breathing. Sifuentes told the detective she then called 911. She denied knowing the child was in need of medical attention until she stopped breathing. During the interview, Sifuentes denied that she, her husband, her sister, or any other family member had abused or mishandled C.G. She could not explain the numerous injuries to C.G. as depicted in the photographs shown to her by Detective Jones. Sifuentes was allowed to leave with her family at the conclusion of the interview.

A neighbor and babysitter noticed C.G. had injuries before her death. A neighbor noticed a problem with C.G.'s arm. Sifuentes told her that the child fell on the tile floor, but she had taken her to the doctor and it was only a sprain. The neighbor believed it was broken because the arm was warm and painful to the touch. Sifuentes admitted to the neighbor at C.G.'s funeral that she had not taken the child to the doctor. The neighbor also mentioned that Sifuentes's six-year-old

autistic son was aggressive and abusive, having once attacked the neighbor's daughter. The neighbor told police the boy would attack other children.

The babysitter also noticed the injury to C.G.'s arm, as well as bruises on C.G.'s face. Sifuentes told the babysitter C.G. injured her arm when she jumped from a chair to the bed. Sifuentes explained the bruises on C.G.'s face, stating A.G. had thrown a boot and hit C.G. in the face. The babysitter also noticed C.G. had a bloody lip.

The jury heard testimony from many of Sifuentes's family members. All of them denied that Sifuentes would injure or allow anyone else to injure a child without taking steps to prevent the abuse. They generally denied seeing the injuries noted by medical personnel and police or knowing that C.G. was injured or sick. Sifuentes's sister noted only that a few weeks before her death, C.G. fell off the bed, falling between the dresser and the bed. According to her, C.G. complained about her head and she put an ice pack on it. She also noted a facial bruise caused when A.G. accidentally closed the car door on C.G. Several family members noted Sifuentes's autistic son had a tendency to attack and injure other children and adults.

Sifuentes testified on her own behalf. She told the jury she was unaware of any injuries to C.G. prior to her death. Sifuentes did not suspect a fractured arm; much less that C.G. was slowly dying from peritonitis. She claimed that on the day of C.G.'s death, she looked normal and had only a slight fever and a runny nose. Although she saw some bruising on C.G.'s back, she saw nothing as severe as what was later depicted in photographs taken after C.G.'s death. She testified she believed the bruising she saw was inadvertently caused by her autistic son. Sifuentes stated she could not explain what happened to C.G.

During trial, Dr. Elizabeth Peacock, a forensic pathologist with the Bexar County Medical Examiner's Office, testified C.G. had numerous contusions and abrasions on her body, including on her head, neck, torso, and extremities. Some of the bruises were older than others–some perhaps

as much as a week old. C.G. also had a healing fracture of her left ulna, and was suffering from bronchitis. An internal examination showed multiple blunt force injuries. The doctor opined that C.G. died as a result of blunt force trauma to the abdomen, which resulted in peritonitis.

Dr. James Lukefahr, a pediatrician specializing in child abuse, testified it would take a "high degree of force" to inflict the abdominal injury suffered by C.G. He stated that poking a child in the stomach would not be sufficient; rather, the most common cause of an injury like the one in this case would be the sudden impact of the seat belt on the abdomen in a high speed motor vehicle collision.

Ultimately, after hearing testimony from the State's witnesses and those presented by Sifuentes, including her own testimony, the jury found Sifuentes guilty of injury to a child by omission. The trial court sentenced Sifuentes to confinement for nineteen years. Thereafter, she perfected this appeal.

## ANALYSIS

In nine points of error, Sifuentes complains the trial court erred in admitting certain evidence, including photographs and alleged extraneous offense evidence. We will review the points raised by Sifuentes in groups, as set forth in her appellate brief.

### *Hospital Photographs–Rule 403*

In her first two points of error, Sifuentes contends the trial court erred when it overruled her objections to the admission into evidence of State's exhibits 1, 2, and 5–34, which are photographs of C.G. Sifuentes argues the photographs should not have been admitted because the probative value of the photographs was substantially outweighed by the danger of prejudice.

We review a trial court's decision to admit photographs under an abuse of discretion standard. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). A trial court abuses its discretion if no reasonable view of the record could support its ruling. *Riley v. State*, 378 S.W.3d

453, 457–58 (Tex. Crim. App. 2012). Thus, we must determine if the trial court's ruling was outside the zone of reasonable disagreement. *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). There should be a reluctance on the part of an appellate court to reverse a trial court's decision on the admission or exclusion of evidence. *Montgomery*, 810 S.W.2d at 378.

"Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible." *Gallo*, 239 S.W.3d at 762. "In other words, if verbal testimony is relevant, photographs of the same are also relevant." *Id.* Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*; TEX. R. EVID. 401. Photographs of the injuries inflicted on the victim are relevant to a jury's determination. *Gallo*, 239 S.W.3d at 762. That relevance is not diminished merely because the jury also heard testimony about the same injuries. *Id.*

Rule 403 of the Texas Rules of Evidence favors the admission of relevant evidence, and carries a presumption that relevant evidence will be more probative than prejudicial. *Aragon v. State*, 229 S.W.3d 716, 724 (Tex. App.—San Antonio 2007, no pet.) (citing *Jones v. State*, 944 S.W.2d 642, 652–53 (Tex. Crim. App. 1996); *Legate v. State*, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref'd)). However, Rule 403 allows for the exclusion of otherwise relevant evidence when the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000). In determining whether the probative value of

photographs is substantially outweighed by the danger of unfair prejudice, a court may consider several factors, including: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed." *Gallo*, 239 S.W.3d at 762. A court must also consider "[t]he availability of other means of proof and the circumstances unique to each individual case." *Id.* These considerations are part of the Rule 403 analysis, allowing the court to determine: (1) how probative the evidence is; (2) the potential for the evidence to affect the jury in some irrational, indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Bibbs v. State*, 371 S.W.3d 564, 575 (Tex. App.—Amarillo 2012, pet. ref'd), *cert. denied*, 133 S.Ct. 1591 (2013).

State's exhibits 1 and 2 were admitted during the testimony of Officer Casburn, the paramedic who attended to C.G. He stated the photographs were of C.G. and fairly and accurately depicted her condition on the day he responded to the 911 call. State's exhibit 1 is a picture of C.G.'s face; State's exhibit 2 is a picture of her entire body. As noted above, Officer Casburn testified C.G. was pale and bruised all over her body – forehead, chest, abdomen, and arms.

State's exhibits 5–34 are photographs of C.G. taken at the hospital by Detective Doyle and an evidence technician. They were admitted during Detective Doyle's testimony. As previously noted, Detective Doyle testified C.G. was badly bruised from her head to her toes. Detective Doyle testified the exhibits fairly and accurately represented C.G.'s condition when he saw her at the hospital.

All of the photographs admitted at trial were black and white, average in size and displayed different views of the bruises and scrapes that covered C.G.'s body. The State did not spend an

inordinate amount of time developing the photographic evidence. In fact, all of the photographs were admitted fairly expeditiously through two witnesses.

Officer Casburn, Detective Doyle, and Officer Guzman testified about the severely bruised condition of C.G.'s body; the photographs support their verbal descriptions. Officer Guzman testified the bruises were so extensive C.G. had a leopard–like appearance. The photographs are visual representations of the testimony from Officer Casburn, Detective Doyle, and Officer Guzman regarding C.G.'s condition. Their verbal testimony was clearly admissible. As the court stated in *Gallo*, "[g]enerally, a photograph is admissible if verbal testimony as to the matters depicted in the photographs is also admissible." 239 S.W.3d at 762.

Sifuentes argues the photographs should not have been admitted because they are gruesome, beg for a highly emotional reaction, and invoke the deepest disgust from anyone who views them. She further argues that although the photographs have probative value, they are so extreme in nature, and of such force, they tend to invite an improper emotional reaction that would overwhelm any rational consideration of the evidence. Moreover, Sifuentes contends the photographs were not needed to prove the State's case and only served to inflame the jury.

Photographs showing a victim's bruises may be admitted to clarify and support observations and conclusions about the victim's injuries, so long as they are not admitted solely to inflame the minds of the jurors. *See Madden v. State*, 799 S.W.2d 683, 696–97 (Tex. Crim. App. 1990) (en banc). The mere fact that the photographs depicted C.G.'s badly bruised body does not automatically render them more prejudicial than probative. *See Hicks v. State*, 860 S.W.2d 419, 426 (Tex. Crim. App. 1993), *overruled on other grounds by Sanchez v. State*, 376 S.W.3d 767 (Tex. Crim. App. 2012). "A trial court does not err merely because it admits into evidence photographs which are gruesome." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (en banc).

Furthermore, Sifuentes was charged with causing serious bodily injury by omission. One of her defenses was that she never noticed anything wrong or out of the ordinary with regard to the child. The photographs were necessary to refute this defense. Moreover, Sifuentes suggested the bruising might have been caused during the efforts to resuscitate C.G. The extensive, body-encompassing bruising shown by the photographs negates any such suggestion. The photographs are strong evidence that Sifuentes must have known something was going on with C.G. and chose to ignore it. The Texas Court of Criminal Appeals has stated, "[v]isual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions." *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999). We hold this was the purpose served by the admission of the photographs in this case.

Based on the foregoing, we hold the trial court did not abuse its discretion in admitting State's exhibits 1, 2, and 5–34. The photographs, although admittedly disturbing, were relevant and of extreme probative value, particularly given the testimony and the defenses asserted by Sifuentes. Considering the relevant law and the specific circumstances of the case, the trial court was certainly within its discretion in determining the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Accordingly, we overrule Sifuentes's first and second points of error.

### *Autopsy Photographs–Rule 403, Cumulative*

In Sifuentes's third through fifth points of error, she contends the photographs taken during C.G.'s autopsy should not have been admitted because any probative value of the photographs was substantially outweighed by the danger of unfair prejudice, particularly given that they were cumulative of the testimony of numerous witnesses. The proper standard of review is the same as noted above – abuse of discretion. *See Gallo*, 239 S.W.3d at 762.

These two points of error concern nine black and white autopsy photographs, State's exhibits 43, 87, 90, 92, 97–98, and 100–102. Dr. Peacock, the medical examiner who oversaw the autopsy of C.G., testified the photographs fairly and accurately represented the condition of C.G.'s body at the time of the autopsy and what she observed during the autopsy. Dr. Peacock testified State's exhibit 43, which depicted C.G.'s face above a series of numbers, was a photograph the medical examiner's office considered "the I.D. photo of [C.G.]." It contained the unique identifier number assigned to the autopsy; the number used to identify all evidence removed from the body. In addition to showing the identifier number, it showed numerous contusions on C.G.'s face.

The other exhibits, also sponsored by Dr. Peacock, depicted the numerous bruises, contusions, and other injuries to C.G. noted during the autopsy. Each photograph showed a different part of C.G.'s body upon which injuries were noted. State's exhibit 87 showed the bruises and injuries to C.G.'s face. Exhibit 90 is a view of the injuries to C.G.'s chin, right ear, and neck. This picture shows irregular abrasions under her chin, extensive healed scars, older injuries on her neck and contusions at the tip of her chin and on her upper chest. State's exhibit 92 depicts the injuries to the left side of the child's neck and upper chest. More specifically, it depicts small white scars and multiple sites on the anterior lateral parts of her neck, chin, and upper chest. State's exhibit 97 shows the injuries to C.G.'s back, specifically a cluster of abrasions over the midline and back of her waistline along the spinal column. Exhibit 98 shows the right side of C.G.'s shaven head and the upper right front of her ear where there is bruising. Exhibit 100 shows the numerous abrasions and contusions on the top of C.G.'s shaven head. State's exhibit 101 focused specifically on the contusions to the left side of the child's shaven head. This photo also showed abrasions and contusions on her back and her neck. Exhibit 102 depicts the abrasions to the back of C.G.'s shave head as well as those on the back of her neck.

When pictorial evidence helps a jury to understand verbal testimony, such as technical language used by an expert or medical doctor describing injuries that a victim sustained during a crime, the photograph is generally admissible. *Harris v. State*, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983) (en banc). A "[p]hotograph must be relevant, thus, it must be *helpful* to the jury." *Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004). Like any other demonstrative evidence, photographs should assist the jury in making a decision, whether that is deciding guilt or punishment. *Id.*

> Photographs are admissible as competent evidence where they accurately portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*Id.* at 490. Where photographs demonstrate the nature, location, and extent of a wound, this court has held their probative value outweighs any prejudicial effect. *Legate v. State*, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref'd).

Autopsy photographs are generally admissible unless they depict some mutilation caused by the autopsy itself. *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003). However, if the troubling nature of the photographs is due primarily to the injuries caused by the defendant, then the changes to the body caused by the autopsy are only of minor significance. *See Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (citing *Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) (holding that pulling back victim's skin did not make photograph more gruesome)).

Sifuentes contends all of the exhibits complained of were exceedingly prejudicial because they show the child naked and in some of them her head had been shaved. She argues the nudity and shaving, which were part of the autopsy process, are a form of mutilation, changing the natural

appearance of the child and inflaming and prejudicing the jury. Sifuentes claims the photographs made C.G. look like a "grotesque mannequin," something that no longer looks human. She also argues the photographs are needless presentations of cumulative evidence.

Of course the photographs are graphic and disturbing – they are, after all, autopsy photographs of a battered and bruised two-year-old. It is also true they depict what several witnesses described regarding C.G.'s injuries. However, it is undisputed that the photographs depict the injuries suffered by C.G. – injuries Sifuentes claimed she never noticed. Although some of the photographs reflect alterations of C.G.'s body due to autopsy procedures, these alterations were fully explained to the jury as necessary for a thorough examination of the injuries. Moreover, shaving the head and removing the diaper allowed the jury to see additional injuries that were not otherwise apparent. The photographs were not notably duplicate or cumulative; rather they show injuries to different areas of the body. The photographs also served as an aid to Dr. Peacock's explanation of the physical injuries suffered by C.G. The photos were relevant to the State's claim that Sifuentes committed the offense of injury to a child by omission, and negated the defenses asserted by Sifuentes. Although the photographs are visual representations of the testimony of several witness, and perhaps "cumulative" in that respect, a photograph is admissible if verbal testimony as to the matters depicted in the photographs is also admissible. *See Gallo*, 239 S.W.3d at 782.

Accordingly, we hold the trial court did not err in concluding the probative value of the photos was not substantially outweighed by any prejudicial effect. *See* TEX. R. EVID. 403. We therefore overrule points of error three through five.

### *Testimony/Pictures of Injuries to A.G.–Extraneous Offense Evidence, Rule 403*

Sifuentes contends in her sixth through ninth points of error that the trial court erred when it allowed the State to introduce testimony describing, and photographs depicting, the injuries to

A.G., C.G.'s four-year-old brother. She argues the testimony should have been excluded because it was inadmissible extraneous offense evidence under Rule 404(b) of the Texas Rules of Evidence, and she argues the photographs were likewise inadmissible under Rule 404(b), but also inadmissible under Rule 403.

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). And, as noted above, a ruling on the balance between probative value and the counter factors set out in Rule 403 is also a question for the trial court. *Id.* However, "that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* Therefore, we review a trial court's ruling on the admissibility of extraneous offense evidence under an abuse of discretion standard. *Id.* As with other evidentiary rulings, as long as the trial court's decision is within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the trial court's ruling. *Id.* at 343–44. "A trial court's ruling is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id*. at 344. In addition, if a trial court's evidentiary ruling is correct on any theory of law applicable, it will not be disturbed. *Id.*

Although evidence of an extraneous offense is normally inadmissible pursuant to Rule 404(b) of the Texas Rules of Evidence, evidence of an extraneous offense is admissible as same transaction contextual evidence to show the context in which a criminal act occurred. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). "This evidence is considered 'res gestae,' under the reasoning that events do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that it may

realistically evaluate the evidence." *Id.* This type of evidence results when an extraneous matter is so intertwined with the State's proof of the charged offense that avoiding reference to it would make the State's case incomplete or difficult to understand. *Smith v. State*, 316 S.W.3d 688, 699 (Tex. App.—Fort Worth 2010, pet. ref'd). "Such evidence imparts to the trier of fact information essential to understanding the context and circumstances of events which, although legally separate offenses, are blended or interwoven." *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).

In this case, the State argues the testimony and photographs showing A.G.'s injuries were admissible as probative evidence and same transaction contextual evidence. The State contends the evidence regarding A.G.'s injuries rebutted testimony that Sifuentes would never ignore a child's injuries or allow them to be injured in her presence. However, we hold such evidence was not "so intertwined with the State's proof of the charged offense" or that without it, the State's case would be "incomplete or difficult to understand." *See Smith*, 316 S.W.3d at 699. The State presented considerable evidence regarding the injuries C.G. suffered, and admitting evidence of A.G.'s injuries did not provide "essential information" to the jury regarding the events or circumstances leading to C.G.'s death. *See Camacho*, 864 S.W.2d at 532. As Sifuentes argues, it was possible for the jury to understand the allegations regarding Sifuentes's omission with regard to C.G.'s injuries without evidence of A.G.'s injuries. We also hold the evidence did not meet the Rule 403 balancing test because it was more prejudicial than probative. Specifically, the photographs of A.G.'s injuries were not relevant to a material issue, and had the ability to impress the jury in a prejudicial manner. *See Erazo*, 144 S.W.3d at 490, 494–95. Therefore, we hold the trial court erred in admitting evidence of A.G.'s injuries.

Although the trial court erred in admitting this extraneous evidence, we hold such error was harmless and does not entitle Sifuentes to a reversal. The error complained of by Sifuentes is

nonconstitutional error, and is therefore governed by Rule 44.2(b) of the Texas Rules of Appellate Procedure. Rule 44.2(A) states nonconstitutional error must be disregarded unless the reviewing court finds it affected the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A harm analysis assesses whether the defendant's substantial rights were affected—that is, whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). As mentioned throughout this opinion, there was an abundance evidence presented to the jury which supported its verdict. Among the extensive evidence, there was trial testimony that: (1) many of C.G.'s injuries were visible; (2) Sifuentes was made aware of such injuries, but yet could not explain the numerous injuries depicted in C.G.'s photographs; and (3) C.G. died as a result of such injuries. Therefore, in light of the evidence presented at trial, we hold the trial court's improper admission of evidence regarding A.G.'s injuries did not have a substantial and injurious effect on the jury's verdict. Accordingly, we overrule points of error six through nine.

CONCLUSION

Based on the foregoing, we overrule Sifuentes's points of error and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish