**Opinion issued July 23, 2024**



**In The**

# Court of Appeals

**For The**

## First District of Texas

_____

**NO. 01-23-00275-CR**

_____

**CAESAR DOMINIC SANCHEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 84073-CR**

---

**MEMORANDUM OPINION**

Caesar Dominic Sanchez appeals his conviction for online solicitation of a minor. *See* TEX. PENAL CODE § 33.021(c). In three issues he argues that the evidence was insufficient to support his conviction, that the trial court erred in

admitting evidence during punishment, and that the trial court erred in denying his motion for mistrial. We affirm.

## Background

In January 2018, ten-year-old Alice[1] accidentally dialed a wrong number on her cellphone. She hung up within seconds of dialing the number. The number belonged to Sanchez, and he began texting Alice. A few weeks later, Alice's mother noticed that Alice had a contact saved as "friend" in her iPhone. When reviewing the messages between them, Alice's mother realized that the contact saved as "friend" was sending sexually suggestive text messages to Alice.

Alice's mother brought the phone to the Pearland Police Department. Detectives assumed Alice's identity and continued to text with Sanchez. Sanchez's texts were sexually explicit, describing sexual acts he would like to perform with the ten-year-old. Once Sanchez made plans to meet "Alice," the police department executed a search warrant at Sanchez's apartment, and Sanchez was arrested. He was charged with online solicitation of a minor.[2] The case proceeded to trial.

Alice's mother testified at trial that Alice had an iPhone when she was 10 years old. Alice's phone contacts included family members, cousins, and a few schoolmates. Alice's parents regularly monitored the iPhone. In reviewing Alice's

---

[1] We use a pseudonym for the minor complainant. TEX. R. APP. P. 9.10(a)(3).

[2] *See* TEX. PENAL CODE § 33.021(c).

2

phone, Alice's mother discovered messages between Alice and a contact saved as "friend." All of Alice's other contacts were saved with their first and last names. Alice sent "friend" photographs of her face, family photos, and a picture of her dog and cat. According to Alice's mother, "friend" sent Alice a meme of a dancing pickle with the phrase "tickle my pickle" as well as sexually suggestive text messages. Alice's mother testified that Alice texted "friend" that she was a child, and "friend" texted her that he was 28 years old. Alice's mother was very upset when she discovered the messages. She took the phone to the Pearland Police Department a few days later and made a report.

Detective Arnold with the Pearland Police Department testified that he received Alice's mother's report. For many years, Detective Arnold had been assigned to the Internet Crimes Against Children Task Force. He had training in undercover chatting. After reviewing the messages on Alice's phone, he saw grooming behavior, where a sexual predator attempts to normalize conversation with a young child so that the child is accustomed to their advances. Detective Arnold and Detective Jaso decided to assume Alice's identity and continue messaging with "friend" to see what his intentions were. They obtained consent from Alice's mother to use Alice's phone and assume her identity. They chatted as Alice for several weeks.

3

Detective Jaso testified that law enforcement discovered that "friend" was Sanchez, and she identified Sanchez in the courtroom. Detective Jaso read several pages of text messages between Sanchez and Alice, or Detective Jaso or Detective Arnold posing as Alice (hereinafter delineated as "Alice"). Detective Jaso stated that as time went on, Sanchez's messages became increasingly more explicit and manipulative. Sanchez texted:

> I feel like you are someone who wants to be special to one person, and I hope one day I can be special to you. I know you're young, so it's not like I'm looking to not wait for you to get older. But I do wish you were because I'd enjoy taking a sex [sic] girl like you out on a date. Hopefully you're the kind of girl who does not get tired of me.

Alice reminded Sanchez of her age, stating, "I wish I wasn't 10." He replied, "Yeah, me too, because then I'd enjoy all of you." He told Alice that he would wait for her and feared getting in "trouble." That afternoon, Sanchez asked Alice whether she had been kissed or "fingered." He texted what he meant by "fingered" in explicit terms.

On February 6, 2018, Sanchez texted, "I guess if I got the chance to keep you company, I would cover you in my kisses." He then described where he would kiss her and how he would do it, suggesting, "I guess I could be a little dirty. I just hope I make you wet."

Detective Jaso testified that Sanchez texted:

> I'm scared of you telling others, too. I'm not going to lie. I thought you weren't real. I'd feel better if you'd wait until you're . . . ready.

4

> Don't get me wrong. Part of me wants to get a room, pick you up, and should have [sic] my big cock inside of you and make you feel my heartbeat as it throbs between your legs. But I want to know what you want. I'm afraid they'd go through your phone and see what we've been writing to each other.

Detective Jaso interpreted this as an invitation by Sanchez to get Alice somewhere alone so he could do these things to her.

A week later, on Valentine's Day, Sanchez asked where Alice lived and expressed his desire to meet her. He asked that she groom her pubic area in a manner he liked and requested a photograph to show that she had done so. They discussed birth control and her age. After expressing that they needed to be careful and calling her "babe," Sanchez messaged, "I wish your folks would go out of town for a day. I want to feel you close to me."

Two days later, Alice told Sanchez that there was a Burger King by her house where they could meet. Sanchez responded, "If I came to a BK and started holding your hand or kissed you, people would question things." Alice responded that she thought they should meet first in a public place as he might be a "creeper." Sanchez responded,

> If I was, I wouldn't have sent pictures of you. I would have been talking sex since we first started talking. And you know I tried holding a level of respect for you because I don't want to be seen that way. I don't know. Maybe it would be better. I just don't get you or me in trouble.

5

After some more messages, Alice responded, "Maybe we should wait. Goodbye." Detective Jaso testified that she sent this message to give Sanchez an opportunity to end the explicit conversation.

Three days later, Sanchez reached out, messaging Alice, "never get [sic] an address, babe," and told her that he knew she was young but thought they should meet at her house "to play with each other and cuddle." Detective Jaso posing as Alice gave Sanchez a fictitious address to a real apartment complex in Pearland and told him that the apartments were across from Burger King. The text message instructed Sanchez to let Alice know when he was there, and she would come down. Sanchez responded that he had condoms and was trying to get off work to be able to see her that day before her mother returned home. Later when Alice texted that she was worried he would arrive too late, Sanchez responded that he was unable to leave work and reiterated, "I really want you bad." Alice told Sanchez to let her know when he can get off work sometime, so she could stay home. Sanchez texted with Alice for a few more days. His final text explicitly described his plan for each to perform oral sex on the other and said, "Sometimes I just want to hear how much you want it."

Four days later, Detectives Jaso and Arnold along with members of the Internet Crimes Against Children Task Force executed a search warrant at Sanchez's apartment. Detective Arnold testified that Sanchez and his wife, and his

6

three children, ranging in age from 11 years old to 10 months old, were at the apartment. Authorities seized Sanchez's phones as well as a memory card. They interviewed Sanchez, who acknowledged that he had been texting with Alice. He said that Alice told him she was 10 years old. Sanchez admitted that he was 31 years old, not 28 like he had told Alice. Sanchez claimed that he had been chatting with a "bot," not a real 10-year-old girl. Detective Arnold testified that Sanchez claimed that he did not know that the photographs Alice sent him were real. Sanchez apologized to the law enforcement in the car as he was interviewed, saying, "I hope I'm not offending you." Detective Arnold testified that he interpreted Sanchez's statements as attempts to please others and to come off as "normal."

A third Pearland police detective testified that he extracted data from the phones involved in the case. He produced a report of each device's content. The detective performed two extractions from Alice's phone, one before the detectives began chatting with Sanchez and another after the detectives had been chatting with Sanchez. The detective testified that he was present when the search warrant was executed at Sanchez's home. Forensic analysis of Sanchez's phone showed that on the day Alice texted him an apartment complex address for the meet up, Sanchez searched for the apartment's address on the internet. He had also searched

for Alice's family on the internet in January 2018, searching her last name and her mother's full name and viewing her mother's LinkedIn account.

Between January 9 and the date in late January that Alice's mother took the phone to the police, there were nearly 470 messages exchanged between Sanchez and Alice. Sanchez then sent over 200 more messages to detectives posing as Alice.

The jury found Sanchez guilty of online solicitation of a minor. During the punishment phase of trial, Alice's mother testified that Sanchez's actions had lasting effects on her family, including leading to the dissolution of her marriage. She described that Alice had been terrified she would have to testify at trial and confront Sanchez. Alice's mother stated that she is extremely protective of Alice and will not allow her to use social media on her cellphone.

The Pearland detective who had extracted data from Sanchez's phone testified that he prepared a report from that phone and from another phone found in Sanchez's apartment. He identified several pornographic images found on the phone in Sanchez's apartment. Over the defense's objection, the images were admitted into evidence, though they were not published to the jury.

Sanchez's father, mother, and stepmother testified for Sanchez. Sanchez's father stated that Sanchez is a good father to his four children, ages 16, 15, 4, and 2

years old.[3] He said Sanchez is a contributing member of society who regularly goes to a Buddhist temple. Sanchez's father believed Sanchez was a good candidate for probation. On cross-examination, Sanchez's father testified that he did not know that Sanchez had gone to trial or been convicted of a crime.

Sanchez's mother testified that Sanchez often volunteers at the Buddhist temple and that he is an involved, helpful father. She stated that Sanchez's wife is deaf and has chronic fatigue. Sanchez's mother believed he was a good candidate for probation so that his children would not suffer without their father.

Sanchez's stepmother testified that she has known him since he was 13 years old. She stated that he had been a good older sibling to her children and that he would be a good probationer because he is a good family man.

In rebuttal, Sanchez's stepdaughter testified for the State. She stated that she had known Sanchez for 9 or 10 years. She testified that Sanchez sent her sexually explicit text messages in 2019 while he was on bond awaiting trial. She stated that she was 13 years old and living in Egypt at the time. She responded to Sanchez that she was not interested in receiving that type of message. She also testified that he asked her to delete a text message he had sent her that contained explicit art.

The jury sentenced Sanchez to 6 years' imprisonment and a $10,000 fine. Sanchez appealed.

---

[3] At the time of the search warrant, Sanchez had three children. By the time of trial, he had four children.

## Sufficiency of the Evidence

In his first issue, Sanchez contends that the evidence is legally insufficient to support his conviction. Specifically, he argues that the State failed to provide sufficient evidence that he intended to meet Alice for sexual contact because sexual contact would not have been possible at Burger King. He also argues sexual contact would not have been possible at the apartment complex because Alice never told him which specific apartment to go to in the large apartment complex.

When reviewing sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id.* Each fact need not point directly and independently to the appellant's guilt so long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We measure whether the evidence

presented at trial was sufficient to support a conviction by comparing it to the elements of the offense as defined by the hypothetically correct jury charge for the case. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018).

> A person commits the offense of online solicitation of a minor:
>
> If the person, over the Internet, by electronic mail or text message or other electronic message service or system, or through a commercial online service, knowingly solicits a minor to meet another person, including the actor, with the intent that the minor will engage in sexual contact, sexual intercourse, or deviate sexual intercourse with the actor or another person.

TEX. PENAL CODE § 33.021(c). "Minor" means "an individual who is younger than 17 years of age" or "an individual whom the actor believes to be younger than 17 years of age." *Id.* § 33.021(a)(1). "Sexual contact" is defined as "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person." *Id.* § 21.01(2).

The indictment alleged that Sanchez, "on or about the 19th day of February, 2018 . . . did then and there with the intent that [Detective] Jaso posing as 10 year old [Alice], an individual whom the defendant believed to be younger than 14 years of age, would engage in sexual contact with the defendant, knowingly solicit by text message [Detective] Jaso posing as 10 year old [Lilly] to meet the defendant."

The gravamen of the offense of online solicitation of a minor is the knowing solicitation of a minor to meet a person, with the intent that the minor will engage

11

in some form of sexual contact with that person or another. *McLeod v. State*, No. 14-22-00684-CR, — S.W.3d —, 2023 WL 8263659, at *7 (Tex. App.—Houston [14th Dist.] Nov. 30, 2023, pet. ref'd). The act of "soliciting" is the prohibited conduct. *Id.*; *Ex parte Wheeler*, 478 S.W.3d 89, 94 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (stating conduct of requesting minor to engage in illegal sexual acts is gravamen of offense of solicitation). The offense is completed at the time of the solicitation, and the requisite intent arises within the conduct of soliciting. *McLeod*, 2023 WL 8263659, at *7; *see* TEX. PENAL CODE § 33.021(c).

The jury heard sufficient evidence to determine that Sanchez knowingly solicited Alice, whom he believed to be 10 years old, to meet at her apartment complex before her mother returned home from work. The jury could infer from the evidence presented that Sanchez's intent was to engage in illegal sexual acts. The offense was complete at the time he solicited Alice. Sanchez argues that the evidence is insufficient because he could not have had sex with Alice at a Burger King, he did not know her specific apartment number, and he did not meet her.

Sanchez's culpability did not require that he meet Alice or that they actually have sexual contact. The crime was complete at the time he solicited Alice to meet for sexual contact. It is the "luring scenario" that allows for the filing of charges against individuals who engage in conversations "with the intent of meeting a child for sexual activity before any sexual contact takes place." *Ex parte Lo*, 242 S.W.3d

12

10, 18–19, 23 (Tex. Crim. App. 2013) (stating crime is complete at time of internet solicitation, rather than some later time "if and when the actor actually meets the child"). The fact that a meeting did not happen is not a defense to the offense of online solicitation of a minor. TEX. PENAL CODE § 33.021(d).

The jury heard that on the day of their planned meeting, Sanchez told Alice that he had condoms and was trying to leave his job to meet her at her apartment before Alice's mother came home. Earlier that day, he had texted her, "I want to kiss you all over." The same day he searched for the apartment complex address sent to him by Alice. The jury could infer from Sanchez's communications with Alice, including the explicit details of his plans that he communicated to her and his urgency in trying to leave his job, that Sanchez had formed the intent to meet Alice for sexual contact that day. Reviewing the record in the light most favorable to the verdict, we conclude the evidence is sufficient to support Sanchez's conviction.

We overrule Sanchez's first issue.

### Admission of Punishment Evidence

In his next issue, Sanchez argues that the trial court abused its discretion in admitting evidence during the punishment phase of trial. Specifically, he argues that the admission of several sexually explicit images found on a memory card in a cellphone in his apartment was substantially more prejudicial than probative. He

argues that the admission of the photographs caused the jury to recommend imprisonment rather than probation.

## A.    Standard of Review

During the punishment phase of trial, the trial court has broad discretion to admit any evidence that it "deems relevant to sentencing" including evidence of extraneous crimes, other bad acts, and character evidence. *See* TEX. CODE CRIM. PROC. art. 37.07, § 3(a). Evidence is relevant if it assists the factfinder to assess an appropriate sentence. *See Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999). Evidence admitted during punishment must satisfy Rule of Evidence 403. *Id.* at 266. Rule 403 provides for the exclusion of relevant evidence when its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. Thus, relevant evidence otherwise admissible under Article 37.07 is inadmissible if it fails to comport with Rule 403. *Rogers*, 991 S.W.2d at 265–66.

Photographs are relevant if there are elements of the photographs that are genuinely helpful to the jury. *Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004) (stating photograph should add something "relevant, legitimate, and logical" to testimony it accompanies and "assist[] jury in its decision-making duties"). The photograph should be excluded if the emotional and prejudicial

14

aspects substantially outweigh the helpful aspects. *Id.* at 491–92. In making this determination, we consider the following non-exclusive set of factors: (1) the probative value of the photographs; (2) the potential of the photographs to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; (4) the State's need for the evidence; (5) the number of photographs; (6) the size of the photographs; (7) whether the photographs are in color or in black and white; (8) whether the photographs are gruesome; (9) whether bodies depicted are clothed or naked; and (10) whether bodies depicted have been altered by autopsy. *See id.* at 489.

We review the trial court's decision to admit photographs under an abuse of discretion standard. *Raford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003). The trial court does not abuse its discretion if its determination lies within the zone of reasonable disagreement. *Id.*

## B.    Analysis

Initially, we note that the eight photographs were admitted into evidence during the punishment phase but were neither published nor described to the jury. The State printed them for identification by the detective who extracted them from Sanchez's cell phone. After the detective identified them during his testimony, the jury was instructed that it could view the photographs electronically if the jury chose to do so. The photographs are pornographic and disturbing. They depict

15

nude women, some with objects inserted into their vaginas, and others brutalized, bloodied, or injured.[4]

In arguing for the probative value of the photographs, the State argues that the photographs contrasted with the way Sanchez's punishment witnesses portrayed him. We agree. "The policies that operate during the punishment phase of a non-capital trial include (1) giving complete information to the jury to allow it to tailor an appropriate sentence for the defendant; (2) the rule of optional completeness; and (3) whether the appellant admits the truth during the sentencing phase." *Erazo*, 144 S.W.3d at 491. The pictures served as a contrast to Sanchez's family members' testimony. Sanchez's family members testified during punishment that he was suitable for probation, volunteered regularly at his place of worship, and spent time with his family and the community. His father testified that he was very close with Sanchez, and yet Sanchez's father did not know that he had been accused or convicted of online solicitation of a minor. The pictures, and that they were stored on a cell phone memory card, supported the inference that Sanchez behaved one way with his family and another way privately. The

---

[4]    Exhibit 12 shows choking bruises on a feminine-seeming neck. Exhibit 13 shows a bloody woman in costume inserting an object into another woman's vagina. Exhibit 14 shows a bound woman nude on a bed. Exhibit 15 is a dark square with no visible imagery. Exhibit 16 shows a female body on the ground with a stick in her vagina. Exhibit 17 shows a sexual device in use on a woman's body and displays the website www.kinkycore.com. Exhibit 18 shows a bloody woman with a leather collar on her neck and stitches on her nipples. Exhibit 19 shows a nude woman standing on a small stool with a padded noose around her neck.

photographs allowed the jury to fully judge Sanchez's character in assessing a punishment.

The images did not lead to the jury deciding punishment on an improper basis, instead they allowed the jury to consider the predatory nature of the crime. Sanchez's crime began with luring and grooming a 10-year-old girl, sending her a meme of a dancing pickle with the phrase "tickle my pickle." Over time he sent her sexually suggestive text messages that increased in both detail and frequency. The communication escalated over two months to Sanchez describing explicit sexual acts he wanted to perform with Alice and arranging to meet her. As the trial court stated during its ruling outside the presence of the jury, "[P]ictures or images of victimization, injury, rape . . . would seem to be relevant towards showing a tendency for predation. This type of offense is a predatory offense, in my opinion, and I think that's one of the reasons why this is a serious offense." The pictures, kept in secret on a cell phone, supported the inference that Sanchez had a side of his personality that he kept hidden from others. The photographs were not difficult for the jury to understand and discussion of admitting them did not consume an inordinate amount of time.

We conclude that the probative value of the images was not substantially outweighed by the danger of unfair prejudice to Sanchez. The trial court's determination that the complained-of evidence was not prohibited by Rule 403

falls within the zone of reasonable disagreement. *See Rogers*, 991 S.W.2d at 266. The trial court did not err by overruling Sanchez's objection to the admission of the evidence. We overrule Sanchez's second issue.

## Closing Argument

In his final issue, Sanchez argues that the prosecutor's closing argument included an improper comment on his right to remain silent, in violation of the Fifth Amendment to the United States Constitution. Sanchez contends that the trial court erred in denying his subsequent motion for mistrial.

## A.    Standard and Governing Law

We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Id.* at 739. "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008) (internal citation and quotation omitted). Counsel's remarks during final argument must be considered in the context in which they appear. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

A comment on the defendant's failure to testify violates the United States Constitution. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011) (explaining that defendant has constitutional privilege not to testify in both guilt and punishment phases of his trial and comment on his failure to testify in either phase is improper); U.S. CONST. amend. V (guaranteeing criminal defendant the right to remain silent). To assess whether a particular statement was a comment on the defendant's right not to testify, an appellate court must view the comment from the jury's standpoint considering the context in which the statement was made. *Randolph*, 353 S.W.3d at 891; *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). A violation occurs only if the spoken words clearly refer to the defendant's failure to testify. *Randolph*, 353 S.W.3d at 891. "The test . . . is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Id.* If the prosecutor's language might reasonably be construed as merely an implied or indirect allusion to the defendant's silence or failure to testify, there is no violation. *Id.*

**B.    Relevant Portions of the State's Closing Argument**

Sanchez complains of the following portion of the State's closing argument during the punishment phase:

> If you remember Monday what one of the jurors in the back said, rehabilitation is the onus of the person. Right? It's their responsibility

19

to get better, to get help, to recognize that they've got a problem. And what, what evidence did you hear of that today? None. You didn't hear a single person, not his dad, not his stepmom, nobody talked to you about how bad he felt. Nobody said he expressed any level of remorse. His dad didn't even know that he had been convicted. Right? No one talked to you about the help he was seeking out, the counseling he was going to get. He didn't get it. Right? Because that was no clue that you needed to get help when you were in the back of a police car surrounded by three other cops asking you why you're asking a 10-year-old — I'm not going to read it. You have absolutely no evidence, no shred of evidence, no testimony, no nothing, that he expresses or feels any amount of regret.

Sanchez's counsel objected and moved for a mistrial or to strike the sentence of the State's closing argument that preceded his objection.[5]

Outside the presence of the jury, Sanchez's counsel argued that the State's closing argument infringed on Sanchez's Fifth Amendment right not to testify. The trial court denied the motion for a mistrial and the motion to strike. The court granted Sanchez's request for a jury instruction. The court instructed the jury that while the defendant may testify, he is not compelled to do so. The court instructed the jury that the fact that a defendant does not testify shall not be considered as a circumstance against him.

## C.    Analysis

A comment by the State on a defendant's failure to show remorse can sometimes constitute a comment on his decision not to testify. *Snowden v. State*,

---

[5]    The sentence was: "You have absolutely no evidence, no shred of evidence, no testimony, no nothing that he expresses or feels any amount of regret."

353 S.W.3d 815, 817 n.4 (Tex. Crim. App. 2011). The statement about which Sanchez complains is not a clear comment on his decision to testify. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (explaining State's comment must contain "clear" reference "that the jury would necessarily and naturally take . . . as a comment on the defendant's failure to testify") (internal quotations omitted)); *Aguilar v. State*, No. 01-15-00972-CR, 2017 WL 3634248, at *10 (Tex. App.—Houston [1st Dist.] Aug. 24, 2017, pet. ref'd) (mem. op., not designated for publication) (same). The State's remark is ambiguous at best. *See Wells v. State*, 634 S.W.2d 868, 873 (Tex. App.—Houston [1st Dist.] 1982, pet. ref'd, untimely filed) (where jury argument "reasonably susceptible to more than one interpretation," "it cannot be concluded that the language was of such character that the jury would necessarily take it to be a comment upon the [defendant's] failure to testify"); *Aguilar*, 2017 WL 3634248 at *10 (holding same).

Reviewed in context, the State's argument followed Sanchez's counsel's argument that the jury should consider probation. Sanchez's counsel told the jury that he would have to register as a sex offender for life and that they had two options: prison or probation. His counsel urged the jury to consider ten years' probation. Moments before the complained-of argument, the State responded to this suggestion, arguing:

> When it comes to probation, you have no control. None. All you get to
> say is if he makes a mistake later, we don't even know what that

21

mistake is, all we're going to allow you to do is send him for this many years. That's why we say ten because even if you were thinking about probation, you give the Judge, you will handcuff the Judge on the term of confinement with your number. So, give [the trial court] all the room we've got because we have no idea what he's going to do in the future. You've got to say at least ten.

But wait a minute, no, you do know what he's going to do in the future because you know when he was out on bond for this case, after he had been interviewed in the back of a police car, or in the back of a car, by three law enforcement agents, just a year later you can read all of this. This is the very definition of grooming. It starts off small. It's innocuous; but within a couple of pages, page 10 [Sanchez's stepdaughter] tells him, "If you're into smut and shit, then you need to get, you need to go somewhere else."

So, you know exactly what he's going to do. You don't get to make him get help. You don't get to tell the Judge what terms he's going to be put on. You have absolutely no input in probation.

In this context, the State argued that the jury should consider imprisonment rather than probation and punishment rather than rehabilitation.

The State's remark could have been interpreted by the jury to be a reference to the defense's punishment witnesses and their seeming obliviousness to Sanchez's criminal behavior. Sanchez's family members seemed unaware that he had solicited Alice, and they presented no evidence of any attempts to get help. *See Randolph*, 353 S.W.3d at 891 ("We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify, if some other explanation for his remark is equally plausible.") (internal quotations omitted). The comment could have been interpreted as a contrast between the fact that Sanchez's life

22

seemed unimpacted by his actions while significantly impacting Alice and her family. Alice's mother testified at punishment that the incident was the beginning of the end of her marriage and had changed the way she parented Alice forever. The State's comment also could have been a reference to the fact that even while out on bond pending trial, Sanchez engaged in similar behavior with his own stepdaughter, who testified that she received sexually explicit text messages from Sanchez when she was 13 years old. *See Garcia v. State*, 126 S.W.3d 921, 924–25 (Tex. Crim. App. 2001) (explaining when State's comments are supported by testimony presented to jury, they constitute proper summation of evidence and not improper comment on defendant's decision not to testify). Sanchez's stepdaughter also testified that he asked her to delete a message that contained sexually explicit art. The State's comment could have been an inference that Sanchez's behavior with his stepdaughter showed he lacked remorse for his actions with Alice.

Viewing the complained-of argument by the State from the jury's standpoint, we conclude that the State's language was not one manifestly intended or of such a character that the jury would necessarily and naturally take it as a comment on Sanchez's decision not to testify. *Randolph*, 353 S.W.3d at 891. Accordingly, we hold that the trial court did not err in overruling Sanchez's objection to the complained-of portion of the State's closing argument and denying his motion for mistrial.

We overrule Sanchez's third issue.

## Conclusion

We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.

Do not publish. TEX. R. APP. P. 47.2(b).